# In the United States Court of Federal Claims

No. 17-868C
(Filed Under Seal: July 31, 2017)
(Reissued for Publication: October 2, 2017)[*]

```
*************************************
TORRES ADVANCED ENTERPRISE      *
SOLUTIONS, LLC,                  *
                                 *
          Plaintiff,             *
                                 *
v.                               *     Postaward Bid Protest; Motion for
                                 *     Discovery; Motion to Supplement the
THE UNITED STATES,               *     Administrative Record; Motion for a
                                 *     Preliminary Injunction; Past Performance;
          Defendant,             *     Bias; Bad Faith; Disparate Treatment
                                 *
and                              *
                                 *
G4S JOINT VENTURE,               *
                                 *
          Defendant-Intervenor.  *
*************************************
```

George R. Calhoun, Washington, DC, for plaintiff.

Tanya B. Koenig, United States Department of Justice, Washington, DC, for defendant.

Gerald H. Werfel, McLean, VA, for defendant-intervenor.

## OPINION AND ORDER

**SWEENEY**, Judge

In this postaward bid protest, plaintiff Torres Advanced Enterprise Solutions, LLC ("Torres") contends that the United States Department of State ("State Department") improperly awarded a contract for local guard services at a United States embassy to defendant-intervenor G4S Joint Venture ("G4S"). Specifically, Torres alleges several irregularities with the State Department's evaluation of the offerors' proposals, including bias, bad faith, and disparate

---

[*] This reissued decision incorporates the redactions described in the court's contemporaneously filed Opinion and Order. Redactions are indicated with a bracketed ellipsis ("[. . .]").

treatment.  Before the court are two motions:  Torres's motion to supplement the administrative record and for expedited discovery ("motion to supplement"), and Torres's motion for a preliminary injunction.  As explained in more detail below, the court denies both motions.

## I.  BACKGROUND

### A.  The Incumbent Contract

In November 2011, the State Department awarded Torres contract SAQMMA12C0008 for the provision of local guard services at the United States Embassy in Asunción, Paraguay.[1] AR 1, 12.  The contract was for one base year, with four one-year option periods.  Id. at 4-5.  The State Department exercised each option, extending the contract to February 28, 2017.  Id. at 148, 154, 158, 269.  On January 31, 2017, the State Department extended the contract for an additional six months, until August 30, 2017.  Id. at 313; accord id. at 312.

The State Department described the purpose of the work to be performed by Torres in the contract's statement of work:

> The primary mission of the local guard service is to provide protection for United States personnel, facilities and equipment from damage or loss due to violent attack and theft.  The local guards act as an early warning signal to the American Embassy and the [regional security officer].  The local guard force will also carry out specific actions as described in the General Orders and individual Post Orders . . . .  The local guard services shall prevent unauthorized access; protect life; maintain order; deter criminal attacks against employees[,] dependents and property and terrorist acts against all U.S. assets[;] and prevent damage to Government property.

Id. at 12; see also id. at 123 (explaining that "General Orders provide directions and instructions of general application to the Contractor personnel" while "Post Orders provide detailed instructions to persons assigned to a specific guard post").  The specific tasks for which Torres was responsible included office building entry control, official residence entry control, vehicular entry control, inspection and surveillance, perimeter patrols, mobile patrols, maintenance of

---

[1]  The court derives most of the facts in the background section from the administrative record ("AR") and the applicable version of the Federal Acquisition Regulation ("FAR").  In addition, the court describes the contents of a March 31, 2017 Contractor Performance Assessment Report ("CPAR") that was originally included in the administrative record filed on June 30, 2017, but was removed when defendant filed a corrected administrative record on July 17, 2017.  A "modified" version of this CPAR, dated June 21, 2017, is included in the corrected administrative record.  See AR 314-22.  However, the "modified" version of the CPAR does not contain Torres's April 13, 2017 comments, and those comments are relevant to Torres's contentions in this protest.

operational records (including post logs, incident reports, and daily time-and-attendance records), provision and assignment of guards and relief guards for each post, on-site supervision of employees, ensuring that the required number of security checks are completed during each shift using a Guard Electronic Monitoring System ("GEMS"), furnishing communications equipment, surveillance detection, submission of a contingency plan, and employee training. Id. at 14-22, 41-43.

Torres's performance of the contract was to be monitored by the regional security officer–a Bureau of Diplomatic Security special agent–who also served as the contracting officer's representative. Id. at 12; see also id. at 31 (reflecting that the designated contracting officer's representative was the assistant regional security officer). Torres's project manager, who was to manage Torres's workforce and act as Torres's liaison with the embassy, was required to implement the directives of the contracting officer and the contracting officer's representative. Id. at 19, 37. Torres was also responsible for providing a guard force commander to lead the guard force, and one or more individuals to supervise the guard force. Id. at 19, 37-38.

In addition, the contract contained a clause addressing the procedures for handling contract performance issues ("clause E.1"). Id. at 26-27. In relevant part, it provided:

> When the Contractor fails to provide the services at the performance standards required by this contract, the Government shall assess a negative incentive expressed as a deduction for each instance of unacceptable performance and/or non-performance . . . . Unless the deficiencies were not reasonably discoverable by the Government, the Government will notify the Contractor and assess deductions as soon as practicable after the unacceptable performance and/or non-performance is discovered by the Government.

> If the Contractor believes that mitigating circumstances precluded the Contractor from meeting the terms and conditions of the contract as it relates to performance or administration of the contract, a request for waiver or reduction of the amount of the deductions can be requested. . . .

> The Contractor's request for relief should provide a detailed explanation as to why the circumstances surrounding the contract noncompliance occurred and why this action could not have been prevented. . . .

> The Contractor shall be required to submit a Quality Assessment and Compliance Report (QACR) with each invoice submission. . . .

> The QACR shall serve as the Contractor's certification that all services included on the invoice were rendered in accordance with the contractual terms and conditions. In the event that the Contractor failed to deliver all the required

services as well as meet the requirements, an explanation shall be given in the QACR as to why the noncompliance action(s) occurred and what action will be taken during the next month to preclude the same and/or similar noncompliance actions.

The Contractor shall also address why their Quality Control Plan (QCP) failed to prevent and/or mitigate the noncompliance acts and what action has been taken or will be taken to modify the QCP accordingly.  Furthermore, the Contractor shall state whether any part of its Management Plan was revised as part of its efforts to preclude the same and/or similar noncompliance actions in the future.

Where the Contractor's review of work performed in any month reveals that the work was not performed in accordance with the terms and conditions of the contract, . . . the Contractor shall not bill the U.S. Government for these services unless the Contractor identifies the nonconforming services.

The Contractor shall reduce the amount of each invoice submitted for payment by the amount of work not performed in accordance with the terms and conditions of the contract . . . unless the Contractor plans to submit a request for waiver or reduction of the amount of the deductions.

Id. at 26-27.  The contract also incorporated by reference three of the FAR's inspection-related provisions:  FAR 52.246-3, Inspection of Supplies–Cost-Reimbursement (May 2001); FAR 52.246-4, Inspection of Services–Fixed-Price (August 1996); and FAR 52.246-6, Inspection–Time-and-Material and Labor-Hour (May 2001).  Id. at 26.  All three provisions (1) require the contractor to "provide and maintain an inspection system acceptable to the Government" that covers the contracted-for supplies and services, (2) require the contractor to maintain "[c]omplete records of all inspection work performed" and make such records "available to the Government during contract performance and for as long afterwards as the contract requires," and (3) permit "[t]he Government . . . the right to inspect and test" the contracted-for supplies and services.  FAR 52.246-3(b)-(c); FAR 52.246-4(b)-(c); FAR 52.246-6(b)-(c).

## B.  Performance Under the Incumbent Contract

During the course of the contract, the State Department prepared regular CPARs regarding Torres's performance.  The first CPAR, signed by the regional security officer and dated June 6, 2013, was for the base year of the contract–February 29, 2012, to February 28, 2013.  AR 151-53.  The second CPAR, signed by the regional security officer and dated April 26, 2014, was for the first option year–March 1, 2013, to February 28, 2014.  Id. at 155-57.  The third CPAR, signed by the prior contracting officer and dated April 13, 2016, was for the second option year–March 1, 2014, to February 28, 2015.  Id. at 271-74.  The fourth CPAR, which is

unsigned and undated, was for the third option year–March 1, 2015, to February 28, 2016.  Id. at 275-78.  The fifth CPAR, signed by the current contracting officer, Yenny Guillory,[2] and dated December 29, 2016, was for the first nine months of the fourth option year–February 29, 2016, to November 23, 2016.  Id. at 279-82.

All five of these CPARs reflect that the State Department was satisfied with Torres's performance–the assessing officials consistently rated Torres as "Very Good" in the areas being rated, such as "Quality," "Schedule," and "Management."  Id. at 151-53, 155-57, 271-82; see also id. at 281 (reflecting Ms. Guillory's assessment, in the CPAR dated December 29, 2016, that "[t]he interaction between Torres and the Government has been excellent").  The assessing officials did note that minor issues arose during contract performance, but indicated that Torres was quick to resolve them.  Id. at 152-53, 156, 273, 276-77, 280-81; see also id. at 280-81 (reflecting Ms. Guillory's comments, in the CPAR dated December 29, 2016, (1) that although the guard force commander did not meet the language proficiency requirement, he was doing an "excellent job," and (2) that "Torres receives a deduct[ion] letter from the [contracting officer's representative] approximately once every 1-2 months," but "takes swift and firm action upon receipt" of those letters).  Indeed, the record reflects that Torres received only five deduction letters and one notice of major nonconformance during the time periods covered by these CPARs, as follows:

- A February 28, 2013 deduction letter noting that a guard was found sleeping at his post for one hour on February 21, 2013, id. at 323;

- A March 21, 2014 deduction letter noting that a post was unmanned for twelve hours on November 17, 2013, id. at 325, to which Torres responded with a letter, dated March 27, 2014, indicating that it counseled the guard force commander and the shift supervisor to ensure that all posts are properly manned, id. at 327;

- A May 6, 2016 deduction letter noting that on April 5, 2016, guards at four posts were not provided the required breaks and one post was unmanned for one hour, id. at 329-30, to which Torres responded with a letter, dated May 11, 2016, indicating that it counseled the guard force commander and the shift supervisor to ensure that all posts are properly manned and sufficient relief guards are available to provide the required breaks, id. at 331-32;

---

[2] Ms. Guillory apparently became the contracting officer sometime between July 20, 2016, and October 12, 2016.  Compare AR 338-39 (reflecting that Kelli Parker was the contracting officer on July 20, 2016), with id. at 346 (reflecting that Ms. Guillory was the contracting officer on October 12, 2016).

- A May 20, 2016 deduction letter noting that a post was unmanned for twelve hours on May 9, 2016, and that three posts were unmanned for twelve hours on May 15, 2016, id. at 333;

- A July 20, 2016 notice of major nonconformance regarding guard use of personal cell phones while on duty, id. at 338-39, issued because two guards were observed "looking at the screens of their smart phones instead of being alert on duty" on July 12, 2016, id. at 335-36, to which Torres responded with a letter, dated July 25, 2016, indicating that the two guards were suspended (one for three days and the other for five days) and counseled that personal cell phone use was a violation of General and Post Orders, that shift supervisors were instructed to look for personal cell phones during post inspections, and that guards were being required to leave their personal cell phones at a designated location when reporting for duty, id. at 340; accord id. at 335; and

- An October 5, 2016 deduction letter noting that a post was unmanned for twelve hours on October 2, 2016, because the guard at the post was using his personal cell phone while on duty, id. at 342, to which Torres responded with a letter, dated October 7, 2016, contending that the acknowledged violation was more properly classified as a failure to follow General and Post Orders rather than as an unmanned post, and advising that (1) the guard was removed from the contract, (2) it had established a personal cell phone policy in which guards were required to check in their personal cell phones prior to reporting to their posts and could only access their phones for emergencies or during lunch breaks, (3) it would remind the guards of its policy during musters and refresher training, (4) it would remove guards from the contract for violation of its policy, and (5) it would screen the backpacks, purses, and bags of all local guard force personnel reporting for duty, id. at 344-45; see also id. at 346 (indicating that Ms. Guillory agreed with Torres's response).

See also id. at 327, 331, 340 (reflecting that when Torres responded to the State Department's correspondence, it regularly stated that it took the violations noted by the State Department "very seriously"). Ultimately, the assessing officials all reported that based on what they knew of Torres's performance, they would either still award Torres the contract, id. at 153, 157, or recommend that Torres be awarded similar contracts in the future, id. at 274, 277, 281; see also id. at 313 (reflecting, in a contract modification signed by Ms. Guillory on January 31, 2017, that the State Department extended Torres's contract performance by six months).

Torres continued to receive deduction letters after November 23, 2016. Indeed, it received three additional deduction letters in 2016, as follows:

- A November 30, 2016 deduction letter noting that a guard was found sleeping at his post for thirty minutes on November 22, 2016, id. at 347, to which Torres responded with a letter, dated December 6, 2016, indicating that (1) the guard had been suspended for three days and counseled that he had violated General and Post Orders, (2) all local guard force personnel would receive refresher training on their duties, (3) the guard force commander would assess shift hours, and (4) shift supervisors would ensure during their inspections that guards remain alert at their posts, id. at 349;

- A December 13, 2016 deduction letter noting that a guard at one post did not have a radio on December 9, 2016, that the radio being used by the guard at that same post on December 12, 2016, had a dead battery, and that many of Torres's radios were in poor condition, id. at 351, to which Torres responded with a letter, dated December 19, 2016, indicating that it (1) counseled the guard force commander and the shift supervisors of their responsibility to ensure that all guards possess the required equipment and that such equipment is in proper working condition, (2) counseled the project manager, guard force commander, and shift supervisors of their responsibility to inspect the equipment and turn in nonfunctioning equipment for repair, and (3) would remind guards of the proper handling of radios at every muster and during a refresher training, id. at 353-54; and

- A December 22, 2016 deduction letter noting that a guard did not properly maintain the log at his post on December 12, 2016, and that a post was left unmanned for one hour on December 21, 2016, id. at 356, to which Torres responded with a letter, dated December 29, 2016, indicating that it had counseled the guard force commander, shift supervisors, and senior guards to ensure that all posts were properly manned, and that it had reminded guards during musters of their responsibility to maintain the logs at their assigned posts, id. at 358-59.

See also id. at 349 (reflecting Torres's statement that it took the violation noted by the State Department in the November 30, 2016 deduction letter "very seriously").

The State Department continued to note deficiencies in Torres's performance in 2017. The first such deficiency related to an incident on February 12, 2017, in which "an unknown individual walked up to the embassy and threw two bottles filled with liquid over the wall in front of the CAC 1 window." Id. at 361. Jonathan Welch, the contracting officer's representative, "reviewed camera footage of the incident and the guards' responses" and discovered:

> E-4 (CAC 1 - Pedestrian Access Control):  Leading up to the . . . event,
> this guard had head down in a personal cell phone while sitting at the CAC 1 desk

and did not notice the individual walk from across the street, walk up the stairs, place his belongings on the bench, walk up to the window in front of CAC 1 and throw two objects over the Embassy wall.  The guard eventually noticed movement and stood up, just in time to see the individual throwing objects.  This guard then made eye contact with E-8 and shrugged shoulders.  Seconds after the event, the guard searched for money and gave the money to the E-8 guard to pick up a bag of food/water at the street corner of the compound.  Throughout the rest of the 12 hour shift, E-4 improperly used the government provided computer to surf the internet and watch movies, while continuously utilizing a personal cell phone and ignor[ing] assigned duties.  At the end of the shift, E-4 screened some incoming guards' bags, while letting other bags pass without inspection.  There is no way to determine how many cell phones made it onto the compound Sunday night.

RT-1 (Senior Relief Guard):  Throughout the 12 hour shift, this senior guard sat next to E4, utilized a personal cell phone, and watched the movies E4 selected on the government computer.  Occasionally this guard left, presumably to relieve another guard, and later returned to perform the same activities already mentioned above.

E-8 (CAC 1 Vehicle Screening):  [T]his guard was on the exterior of CAC 1 vehicle entrance and saw the individual walk toward the CAC 1 pedestrian entrance window, throw two objects over the wall, pick up his bag from the bench, and slowly walk away from the area.  The guard slowly walked in the direction of the individual, made no attempt to intercept, identify, or resist the criminal activity.  After the criminal activity, the guard made no attempt to intercept or identify the individual.  The guard stood in place and watched the suspect slowly depart the area, cross the street, and disappear from the camera's view.  These actions are in violation of the general guard orders and the overall mission of the local guard force service.  The guard at E-8 then walked to the CAC 1 pedestrian door, took money from the guard at E-4, retrieved a bag of food/water from the street corner, and returned it to the guard at E-4.

Id.  Mr. Welch reached several conclusions:

The E4 guard position . . . cannot be trusted to effectively screen backpacks, purses, and bags of all [local guard force] personnel reporting for duty, when this guard is in fact using a personal cell phone throughout the shift.  This check must be performed by the Supervisor.  The cell phones must not be stored in an accessible area, such as under the desk of CAC 1.  For emergencies, guards should give the phone number of the [local guard force] radio dispatch as the emergency number to call, with the Supervisor number as a secondary to all family members, school administrators, etc.

The major non-conformance issue of personal cell phones on duty has not been addressed adequately since the first notification six months ago.

This deficiency endangers performance of the contract and the safety and security of the Mission.

Id. at 362.  Thus, in a deduction letter dated March 1, 2017, Mr. Welch directed Torres to (1) develop "[a] comprehensive plan to control cell phone usage on duty"; (2) schedule training on General Orders, defensive tactics, and the use of batons and handcuffs; and (3) propose corrective action "that will actually stop this activity from happening in the future."  Id.

Torres's Director of Operations and Senior Program Manager, Richard Orth, responded to the deduction letter on March 7, 2017, acknowledging the violations, id. at 363, and describing Torres's proposed corrective action:

Following the incidents of February 12, 2017, Mr. Victor Segovia, Torres Project Manager[,] conducted remedial training [as directed].  . . .

. . .  Torres has removed the guards that were caught using their cell phones while on duty from the contract.  Torres has put a policy in place that all guards will check in their personal cell phones prior to reporting to their posts and pick them up when they complete their duties.  These cell phones will now be stored in the Guard Force Commander's office or secured in a locker at other sites such as USAID and Peace Corps.

Torres will allow the guards to use their cell phones for emergencies when relieved from their post and during their assigned lunch break.  At no time will a guard have his/her personal cell phone at post.  Torres will remind all guards of this policy at every shift change and during refresher training and will remove guards from the contract for non-compliance.  In addition, the Shift Supervisor will oversee the screening of all backpacks, purses, and bags of all [local guard force] personnel reporting for duty.

Torres has given all [local guard force] personnel the phone number of the [local guard force] radio dispatch as the emergency number to call, with the Supervisor number as a secondary number to provide to all family members, school administrators, and others as needed.

Id. at 364.  That same day, Mr. Welch advised Mr. Orth via electronic-mail that he did not consider Torres's plan to be comprehensive.  Id. at 366.  He acknowledged that "some of the required actions in the deduction letter have been met," but noted:

This is the third corrective action plan for cell phones since July 2016. Obviously, the previous two plans were unsuccessful.

This third corrective action plan must be comprehensive and well thought out.

For example, your letter states the guards will have access to their phones during lunch breaks and emergencies.  Who will be checking in and checking out the cell phones to guards, opening and closing the door to the [guard force commander's] office throughout the day and night?  Supervisors and the [guard force commander] are the only guards able to access the [guard force commander's] office.  Supervisors and the [guard force commander] cannot be on phone issuance duty.

For [off-site locations,] what is the comprehensive plan to prevent cell phone use on duty?  Stating the phones will be stored in a locker is a start, but not comprehensive.

How will claims of theft or tampering of the phones be avoided?

How will the phones be identified to each guard?

I'm sure there are other questions the supervisors and guards will have.  A one sentence policy will result in confusion and potentially grievances by guards in the near future.

Id. at 366-37.  Mr. Welch therefore advised Mr. Orth that he expected Torres to submit "a full written policy" and "a comprehensive corrective action plan that explains how this checking-in/out of phones will actually work."  Id. at 367.

Mr. Orth acknowledged Mr. Welch's request via electronic-mail, id. at 366, and in a March 31, 2017 letter, described Torres's revised corrective action:

a.  Following the incidents of February 12, 2017, [Mr. Segovia] conducted remedial training [as directed].  . . .

b.  . . . .  Torres has removed the Guards that were caught using their cell phones while on duty from the contract.

c.  Torres has put a policy in place that all Guards will check in their personal cell phones prior to reporting to their Posts.  Guards will not have access to their personal phones during the duration of their duties and will only be able [to] pick them up when they complete their duties.

-10-

d.  The Shift Supervisor will write the Guard's name on a tag and will attach it to the cell phone.  The Shift Supervisor will give the Guard a copy of the cell phone tag which will include the cell phone claim number.  These cell phones are to be placed in a secure box during shifts.  This box will be kept in the Guard Force Commander's office.

e.  In the case of an urgent situation or emergency the Guard will advise the Supervisor of the problem.  Then the Supervisor will allow the Guard access to a Government Furnished Property/Contractor Furnished Property . . . telephone/cell phone.

f.  Additionally, the Shift Supervisor will oversee the screening of all backpacks, purses, and bags of all [local guard force] personnel reporting for duty at the Main Embassy Compound to ensure no cell phones go with the Guard to his/her Post.

g.  For other locations oversight of this policy will fall under the Senior Guard at Post . . . .

h.  At no time should a Guard have his/her personal cell phone at post.  Torres Supervisors will remind all guards of this policy at every shift change and during Annual Refresher Training.

i.  Torres will remove guards from the contract for non-compliance[.]

Id. at 369-70.

While Torres was resolving the issues revealed by the February 12, 2017 bottle-throwing incident, another incident occurred that revealed additional deficiencies in Torres's contract performance.  See generally id. at 371-73.  As a result of an investigation of a residential burglary by Mr. Welch at the end of February 2017, Ms. Guillory discovered that Torres's "mobile patrol guards [were] not performing their contractual duties."  Id. at 371.  Specifically, the initial investigation revealed

a more than 12 hour gap of a residential check on this residence from 1942 on Sunday night until 0808 Monday morning, at which time the mobile patrol notified the occupant of an open garage door.  The burglary occurred sometime in that 12 hour gap, during which there should have been at least 3 more checks during the night shift.  Correct performance may have at most detected and deterred the burglary and theft of personal property, and at least narrowed the window of investigation.

Id.  Further investigation, entailing the "review of mobile patrol logs, GEMS logs, and [Global Positioning System ("GPS")] tracking data for each mobile patrol" for the four-day period

surrounding the burglary, "revealed falsified logs by drivers calling in locations to the security dispatcher where the drivers were not actually located, GEMS reports reflecting unsatisfactory rounds including zero checks on some residences in a 12 hour shift, and GPS tracking data supporting the unsatisfactory GEMS reports."  Id.  This review also revealed that "two day shift drivers left their patrol area for hours during each shift," spending "hours at residential neighborhoods, businesses, and other locations in the cities of Luque and San Lorenzo, both approximately 10 kilometers outside their patrol areas, and, not coincidentally – the homes of record of the respective drivers."  Id.  Ms. Guillory concluded that "[s]upervision of the mobile patrol [was] nonexistent," explaining:  "GEMS reports do not match logs called in by the mobile patrols, but the discrepancies have gone undetected (or at the least unreported to the [contracting officer's representative]) by the Supervisors, Guard Force Commander, and Program Manager." Id. at 371-72.  She further concluded that these performance deficiencies constituted violations of the contract and Post Orders.  Id. at 372-73.  Accordingly, in a March 3, 2017 letter, Ms. Guillory advised Torres that the State Department considered the violations to be "a condition that imposes an unacceptable performance risk [that would] be documented as such" in a CPAR, and directed Torres to submit a corrective action plan within ten business days.  Id. at 373.

Mr. Orth responded to Ms. Guillory's letter on March 16, 2017.  Id. at 374-76.  He acknowledged the violations, id. at 374, and described Torres's plan for corrective action:

> [Mr. Segovia] counseled the [guard force commander] and the Shift Supervisors reminding them to be more proactive in their inspections of the Mobile Patrols.  The [guard force commander] conducted a meeting with all of the drivers and reminded them to adhere to the Standards of Conduct while performing their duties.

> The two drivers who left their assigned posts without proper authorization were counseled, removed from Mobile Patrol duties and reassigned to static guard posts.

> The [guard force commander] now closely monitors and evaluates GEMS reports.  [Mr. Segovia] has proposed to the [contracting officer's representative] adding another monitor where the Radio Dispatcher is located.  This will enable the Radio Dispatcher to more effectively supervise the rounds of each Mobile Patrol and verify locations using the GPS tracking system.

> On March 3, 2017[, Mr. Orth] met with the [Mr. Segovia], [the guard force commander] and Supervisors and briefed them on the importance of proactively conducting Quality Control Inspections and ensuring guard compliance of their General Orders and Post Orders.

> On March 4, 2017[, Mr. Orth] conducted a ride along inspection with Mobile Patrols and Supervisors.  . . .

> A refresher training will be scheduled for all Mobile Patrol drivers for next month (April 2017) to enhance and improve the performance of the [Mobile Patrol] posts.

Id. at 375.  Ms. Guillory was not entirely satisfied with the described corrective action.  Id. at 377-78.  In a March 17, 2017 letter, she directed Torres to remove the two guard/drivers who left their assigned posts from the contract due to their "failure to comply with the standards of conduct"–they "misuse[d] paid labor hours and resources provided to perform duties exclusive of the scope of the contract."  Id. at 377.  She further directed Torres to remove another employee from the contract for his conduct related to the falsification of the mobile patrol logs.  Id.; see also id. at 379 (indicating that this employee was another guard/driver).  Finally, she directed Torres to submit a revised corrective action plan within ten business days.  Id. at 378.  In a March 31, 2017 letter, Mr. Orth advised Ms. Guillory that Torres had removed the three guards/drivers from the contract and that its employees were "closely monitor[ing] the Mobile Patrols through daily reviews of the Vehicle Tracking System . . . and the GEMS reports."  Id. at 379-80.

That same day–March 31, 2017–Ms. Guillory prepared a sixth CPAR for Torres's performance of the contract during the final three months of the fourth option year–November 24, 2016, to February 28, 2017.  Original AR 279-311, June 30, 2017.  In this CPAR, Ms. Guillory described the recent issues with Torres's performance, including the issues with the mobile patrols, and described some additional concerns.  Id. at 280-85.  For example, with respect to "Management," she wrote:

> Torres['s] management was assessed at three levels:  the corporate management support, local program support office, and the [local guard force] supervisors.  Overall management has suffered due to lack of quality control inspections[,] lack of involvement by the corporate [project management office,] and the local [project manager] serving as the sole instructor for the guards for both basic training and refresher training.  The [project manager] has [been] engaged in support of other Torres contracts in country, instead of the [local guard force].  The [local guard force] supervisors generally employ sound management tactics and have done a good job . . . .  However, supervision of mobile patrols is not satisfactory.  . . .  [Local guard force] supervisors are ineffective in managing the drivers, and their lack of supervision allowed the mobile patrol to create unsafe conditions for embassy personnel . . . .  Despite evidence of insufficient checks documented in GEMS reports, supervisors continued sending the GEMS reports to the Government, without reviewing the data for correct compliance, putting the burden on the Government to identify their shortfalls.

Id. at 281.  Additionally, with respect to "Training," she wrote:

> All new guards should receive 80 hours of orientation and initial training; however, starting January 10, 2017 the Program [sic] Manager put on the basic

course that lasted less than 40 hours without informing the Government of the
course schedule or requesting a reduced time requirement[,] and the quality of the
training was not up to the contract requirements.  After further inspection by the
[contracting officer's representative], some required courses were left out of the
training.  At [the contracting officer's representative's] direction, the [project
manager] added more days and required training courses to meet [contract]
requirements.  The [project manager] was the instructor of the basic training
course, which took him away from performing any other management duties for
the duration of the course. . . .  Other Torres contracts took precedence over the
[local guard force] contract during the January basic training and February
refresher training, which took place February 28, 2017.  The basic training was
moved from the main training facility to a small office (without [contracting
officer's representative] notification or approval) with little to no space for
practical exercises, and the refresher training lacked logistical resources (a red
man suit) due to Torres'[s] other contracts taking precedence for facilities and
equipment.

Id. at 282.  In conjunction with her comments, Ms. Guillory downgraded Torres's ratings for
"Quality" and "Management" from "Very Good" to "Unsatisfactory."  Id. at 280; see also id. at
280 (reflecting that Ms. Guillory increased Torres's rating for "Schedule" from "Satisfactory" to
"Very Good"), 280-85 (reflecting that Ms. Guillory offered many positive comments regarding
various aspects of Torres's contract performance).  She concluded the CPAR by remarking that
the State Department lacked confidence that the identified issues could be resolved, and
ultimately concluded that given what she knew of Torres's performance, she would not
recommend that Torres be awarded similar contracts in the future.  Id. at 285.

Mr. Orth, on Torres's behalf, responded to this latest CPAR on April 13, 2017, reiterating
many of the comments and explanations that he had provided in prior correspondence.  See id. at
285-311.  Additionally, responding to Ms. Guillory's management-related comments, he wrote:

Torres's Quality Control Inspections by Senior Corporate personnel are value
added to the contract and not required by the contract.  And even though not
required, the Government statement that there has been a lack of inspections or
involvement by senior management is untrue.  Torres [Chief Executive Officer
("CEO")] Jerry Torres has conducted at least 50 Quality Control Inspections
within the last 18 months.  This includes Mobile Patrols, Marine Residence, Peace
Corps Training site, USAID, and Peace Corps Administration site.  Torres
Regional Administrative Manager Ivana Tuset has conducted Quality Control
Inspections of the Project Management Office during the current Period of
Performance.  The [project manager] also conducted Quality Control Inspections
on 24 November 2016, 19 December 2016, 14 February 2017 and 28 February
2017 during the current Period of Performance.  The Director of

Operations/Senior Program Manager conducted his semi-annual Quality Control Inspection of the Paraguay [local guard force] 4 and 8 March 2017.

. . .   The current contract . . . does not require the Project Manager to be dedicated exclusively to the contract.  Therefore, basing an Unacceptable rating on something that is not required by the Contract is inappropriate.

The [project manager] provides oversight of all [local guard force] training.  He conducted specific classes within Basic Guard Courses with very small class size (six people) 10-23 January 2017.  . . .  The [project manager] normally does not serve as the Primary Torres Instructor, however, on occasion he serves as the Primary Instructor as needed.  Additionally, [h]e supports Torres's other instructors as needed.

Id. at 289-90; see also id. at 292 (disputing Ms. Guillory's comment that Torres's other contracts took priority over the contract for the United States Embassy in Asunción, Paraguay).  Further, with respect to mobile patrols, Mr. Orth provided:

Similar incidents have occurred on a sporadic basis in previous years and Torres consistently has fired the personnel responsible.  Previous CPAR[s] did not cite Mobile Patrol problems, but instead noted that, "Anytime Post had an issue with guard performance, Torres has responded quickly to remedy whatever problem there may be."  Torres also has fired the three Guard/Drivers involved on 21 March 2017.

The single Mobile Patrol incident cited in the evaluation is not a systemic issue with Torres.  To the extent it is an issue, it is with the quality of the local labor force available to serve as guards.  G4S had similar issues previously with Mobile Patrols during its contract.  Under the previous G4S contract, the [local guard force] had issues with Guard/Drivers that were far worse than Torres has experienced.  Guard/Drivers and policemen were getting caught sleeping inside the vehicles during duty hours.[3]  Residences were not checked as per Post Orders. G4S did not replace Mobile Patrol vehicles as required by the contract when [they] reached their maximum number of kilometers allowed.  G4S only had one relief guard over the life of its previous contract.  Torres's management has improved significantly on this performance and has had to fire far fewer guard/drivers than the previous contractor according to Torres's [project manager,] who served as G4S's [project manager].

---

[3]  "The Mobile Patrol is a two-man team consisting of a Mobile Patrolman and a Paraguayan National Police officer or Supervisor . . . ."  AR 107.

-15-

Id. at 293 (footnote added); see also id. at 305 ("Mobile Patrol deficiencies are common worldwide by Security Companies performing Local Guard Force Services for U.S. Missions. The rating provided is inconsistent with prior evaluation practices and disproportionately punitive of Torres.  Torres identified an issue with local personnel and took swift corrective action to fire the drivers involved.").  Finally, Mr. Orth addressed Ms. Guillory's training-related comments:

> With respect to training times, in an email dated 18 January 2017 the [project manager] informed the [contracting officer's representative] that the Basic Guard Course is taking less time to cover all the required material.  The [contracting officer's representative] stated, "Less than 80 hours may be reasonable for a small class.  In order to assist me in making that determination, please send me the detailed course schedule for last week and this week.  Also, I will need to review each student's results of class quizzes, class examinations, mid-term examination, and final examination."  Torres added additional training hours after the [contracting officer's representative's] review.  The fewer the people to be train[ed] tends to speed up training time.  Torres trains to Standard not to Time. Those trained passed all requirements in less than 80 hours.  As all Government required courses were taught to standard, and Torres conveyed the fact of the accelerated schedule to the [contracting officer's representative], Torres should not receive a poor evaluation.

Id. at 292; accord id. at 301-02.  Mr. Orth summed up:

> As it has done previously, during the current rated period, Torres continued to respond rapidly to remedy problems identified by the Government in deduct[ion] letters, deficiency notices, or otherwise.  Given that Local Guard Force Services contracts rely on humans, predominately low paid guards, to execute the majority of the requirements of the contract, there is the potential that mistakes and errors will occur, including poor performance by selected individuals.  In previous evaluations, the Department of State appears to have recognized and accounted for this reality.  Therefore, how Torres responds to and corrects issues should be the primary criteria for evaluating performance.  Torres prides itself on identifying and correcting problems before they occur to the maximum extent possible.  In those instances where problems occur, as noted in previous [Contractor Performance Assessment Reporting System ("CPARS")] evaluations, Torres responds rapidly to remedy identified deficiencies.  Torres's Project Manager . . . , who previously served as the G4S [project manager] on the Paraguay [local guard forces] contract, has never had a negative comment in the previous CPAR[s] cited above.  Embassy personnel have recognized Torres's strong performance as recently as last month and again in April 2017.

Id. at 307-08.  He therefore indicated his nonconcurrence with the CPAR and requested a reevaluation.  Id. at 311.

In the meantime, despite Torres's efforts to closely monitor its mobile patrols, the State Department identified several instances when a mobile patrol failed to complete the four required rounds during a shift (in most instances, the mobile patrols completed three rounds).  AR 383-84.  In an April 12, 2017 deduction letter, Mr. Welch indicated that the failures occurred with two mobile patrol units on March 24, 2017, one mobile patrol unit on March 25, 2017, two mobile patrol units on March 26, 2017, one mobile patrol unit on April 1, 2017, and one mobile patrol unit on April 5, 2017.  Mr. Welch stated that Torres had "failed to provide a corrective action that [would] stop this activity from happening" and prompted Torres to "put in place a realistic and reliable corrective action plan to correct the quality of [its] patrol services."  Id. at 385.  In an April 19, 2017 letter, Mr. Orth acknowledged the violations, id. at 386, and provided Mr. Welch with a timeline of Torres's "additional corrective action":

    1.  On April 12, 2017, a Contractor-Furnished Property . . . computer with internet service was placed at the Radio Dispatcher Post.  The Radio Dispatcher can now more effectively supervise the rounds of each Mobile Patrol and verify locations using the GPS tracking system in near real time.

    2.  Starting on April 20, 2017[, Mr. Segovia] will use the Daily Mobile Patrol Rounds Verification Report to conduct daily reviews of GEMS Reports[,] the Vehicle Tracking System . . . [,] the Mobile Patrol Logs . . . [,] and Radio Dispatcher Logs from the previous 24 hours.  He will submit this Report to the [contracting officer's representative and Mr. Orth].

    3.  Starting on April 20, 2017[, the guard force commander], Supervisors and Radio Dispatchers will also use the Daily Mobile Patrol Rounds Verification Report to monitor and review Mobile Patrol rounds.

    4.  Starting on April 20, 2017[,] . . . when the Mobile Patrolman (Guard/Driver) conducts the radio check every thirty minutes, reporting the patrol's location and Residence checks for the last 30 minutes[,] the Radio Dispatcher will confirm the Residences to be checked over the next 30 minute period.

    5.  On April 21, 2017[,] Torres has scheduled Refresher Training for all Mobile Patrol Drivers to enhance and improve the performance of the [Mobile Patrol] posts.  Torres will conduct this Refresher Training in two groups to maintain continuity of services.

Id. at 386-87.

Meanwhile, on April 13, 2017, six days prior to Mr. Orth's letter describing Torres's additional corrective action and the same day that Torres responded to the most recent CPAR, Ms. Guillory sent a cure notice to Torres's CEO, advising him that the State Department considered Torres's "deficient performance under the [contract] as an unacceptable condition that may endanger performance of the contract and place the security of the U.S. Embassy in Asunción, Paraguay in serious jeopardy." Id. at 390.  She indicated that the purpose of the cure notice was to "draw Torres's immediate attention to the need to make a reasonable effort to stabilize the delivery of services in accordance with the terms and conditions of [the] contract." Id.  In particular, she explained:

> It is clear from the deficiency notices, deduction letters and non-performance compliance[] letters submitted during Option Year Four (4) and the current [extension of that option year], [that] the [United States government] has documented the deficiencies and violations to contract requirements starting July 20, 2016 through April 5, 2017.  Torres has not resolved the documented deficiencies regarding cell phone usage, Mobile patrol[s] . . . [,] and lack of Quality Controls on behalf of the contractor.

Id.  Ms. Guillory then discussed the three areas of deficient performance–personal cell phone usage, mobile patrols, and quality control–in more detail.  Id. at 391-94.  With respect to the first two areas, she summarized the problems and responses that were described in earlier correspondence and the most recent CPAR.  Id. at 391-93.  With respect to quality control, Ms. Guillory wrote:

> The FAR clauses which are incorporated by reference into the contract clearly put the burden of implementing quality control onto the contractor.  It is clear from the discussion under the cell phone and vehicle rounds [issues] that Torres is failing to perform the quality control required under the terms of the contract.  While the government has the right to conduct quality assurance, this right does not shift the burden of performing quality control from the contractor to the government.  Torres must implement an acceptable quality control plan as required by the terms of the contract.

> Torres . . . has not provided an accurate [Quality Assessment and Compliance Report] in regards to:

>> 1.  Failure to make rounds on the mobile patrol:  failure to self-report issues and failure to self-deduct when applicable.  The government has to do a thorough daily review of operations instead of a spot check.

>> 2.  GEMS reports have been not accurate and GPS systems find recurring failure to comply with the contract requirements . . . .

-18-

3.  Cell phone use:  failure to self-report issues and failure to self-deduct when applicable.

4.  Deductions directed by the [United States government].  The [contracting officer's representative] has to reject invoices that did not include requested deductions on a monthly basis.

5.  The contractor has failed to self-report and self-deduct through the life of this contract[ and] the [United States government] has had to dedicate time to find the issues.

6.  . . . [Mr.] Segovia has failed to report failures and non-compliance issues under this contract described [from] July 20, 2016 to April 5, 2017.  One of his duties . . . :  Responsible for all quality control of guard services.

At the Corporate level, Torres . . . has failed to reassure the [United States government] that issues described above will be resolved effectively and in a timely manner.

Id. at 393-94.  Overall, Ms. Guillory concluded that Torres's "substandard performance . . . [had] been a recurring issue beginning in" the fourth option year and continuing through the six-month extension of contract performance, and that the State Department lacked "reassurance that the issues will be effectively resolved regarding the cell phone usage, the mobile patrol violations and the lack of quality control." Id. at 395.  She therefore "demand[ed]" that Torres submit a corrective action plan within ten business days "that clearly and comprehensively addresse[d] the steps to immediately correct each of the" specified deficiencies, warning Torres that she might "consider it reasonable and necessary" to terminate the contract for default. Id.

Mr. Orth responded to the cure notice on April 24, 2017. Id. at 396.  With respect to the personal cell phone use issue, he noted that since Torres implemented the revised corrective action plan set forth in its March 31, 2017 letter, it "[had] not had a cell phone incident." Id. at 398-99.  With respect to the mobile patrol issues, he provided some new information–for example, explaining that the failure of some of the guard/drivers to complete four rounds during their shifts on March 24 to 26, 2017, was due to the need to respond to alarms at residences, the need to remain at a residence with an open gate, and a vehicle breakdown–and then reiterated both the corrective action described in his March 16, 2017 letter and the additional corrective action described in his April 19, 2017 letter. Id. at 402-03.  And, with respect to the quality control issues, he summarized the number and types of quality control inspections that Torres's personnel had recently conducted. Id. at 405.  After addressing these three issues, Mr. Orth responded to each of the numbered problems identified by Ms. Guillory:

Failure to make rounds on the mobile patrol:  failure to self-report issues and
failure to self-deduct when applicable:  Since the beginning of the contract the
[project manager], [guard force commander] and Shift Supervisors have
counseled, suspended and/or terminated many guard/drivers for not following . . .
Post-specific Orders.  Torres has used more than 20 qualified guards, including
several Senior Guards, as Mobile Patrol drivers in a constant search to improve
the work of the [local guard force], specifically the Mobile Patrols.  Torres
deemed these actions as on-the-spot corrections not warranting self-reporting.

GEMS reports have been not accurate and GPS systems find recurring failure to
comply with the contract requirements . . . :  Torres has always provided GEMS
reports on a daily basis to the [contracting officer's representative].  Torres's latest
[corrective action plan], addressing Mobile Patrol deficiencies and dated April 19,
2017, will also correct this recent shortfall.

Cell phone use:  failure to self-report issues and failure to self-deduct when
applicable:  Since the contract began on February 28, 2012, Torres has, through
the daily inspections conducted by its [project manager], [guard force
commander] and Shift Supervisors, counseled, suspended and/or terminated many
guards for not following General/Post Orders as they relate to the use of cellular
phones while on duty.  Torres deemed these actions as on-the-spot corrections not
warranting self-reporting.  Through the life of this contract the [project manager],
[guard force commander] and Shift Supervisors have notified the [contracting
officer's representative] of several issues of non-compliance by [local guard force]
personnel.

Deductions directed by the [United States government].  The COR has to reject
invoices that did not include requested deductions on a monthly basis.  Torres has
always included [United States government]-directed deductions in its invoices.

The contractor has failed to self-report and self-deduct through the life of this
contract, the [United States government] has had to dedicate time to find the
issues.  Since the contract began on February 28, 2012, Torres has, through the
daily inspections conducted by its [project manager], [guard force commander]
and Shift Supervisors, counseled, suspended and/or terminated guards for not
following General/Post Orders as they relate to the use of cellular phones while on
duty.  Torres deemed these actions as on-the-spot corrections not warranting
self-reporting.  Until February 2017, the [contracting officer's representative]
appeared satisfied with the actions taken by Torres to identify and correct these
issues, and therefore Torres had no reason to self-deduct.

[Mr.] Segovia[] has failed to report failures and noncompliance issues under this
contract described [from] July 20, 2016 to April 5, 2017.   One of his duties . . . :

> Responsible for all quality control of guard services.  From July 20, 2017 through
> April 5, 2017, [Mr.] Segovia[] has counseled, suspended and/or terminated guards
> from this contract for failures and non-compliance by [local guard force]
> personnel.  He has disciplined Guards and other [local guard force] personnel . . . .
> Guards have been disciplined for sleeping on Post, using cell phones and
> reporting late for work, and Mobile Patrols have been disciplined for not making
> their rounds per the contract.

Id. at 405-06.  Finally, Mr. Orth described Torres's proposed corrective action:

> i.  As stated above, Torres has implemented a more robust daily method for
> ensuring contract compliance by its Mobile Patrols . . . .  Torres will self-deduct
> based on the results of the Daily Mobile Patrol Rounds Verification Reports when
> warranted.
>
> ii.  [Mr. Orth] will travel to Paraguay from May 6-10, 2017 to assess the
> implementation of Torres's [corrective action plans] as well as to conduct another
> [quality assurance/quality control ("QA/QC")] inspection of the [local guard
> force].  He intends to meet with the [contracting officer's representative] and
> [regional security officer] to discuss [local guard force] performance and to
> discuss collaboratively how Torres can continue to improve its contract
> performance.
>
> iii.  Torres's CEO will continue performing spot (ad-hoc) QA/QC inspections
> while in Paraguay.
>
> iv.  Torres's Regional Administrative Manager will continue monthly, if not
> bi-weekly, [Project Management Office] inspections.
>
> v.  During his weekly [project manager] teleconference call, [Mr. Orth] will assess
> contract compliance, identify potential issues and develop and implement
> proactive solutions before they become issues.

Id. at 407.

Ms. Guillory responded to Mr. Orth's letter on May 9, 2017, taking issue with a number
of his statements.  Id. at 410-12.  Among other comments, she remarked that (1) an April 20,
2017 review of GEMS records from two to three randomly selected days over a four-month
period (from November 2016 to February 2017) revealed "1,450 failures to make rounds"; (2)
clause E.1 and the inspection-related FAR provisions "clearly put the burden of implementing
quality control onto the contractor"; (3) "[t]he government has a tracking record of deductions,
deficiency letters and other performance related communication between the [contracting
officer's representative] and the [project manager] to support [allegations] of lack of quality

control measures and self-reporting by Torres"; and (4) Torres was required, pursuant to clause E.1, to self-report all incidents that resulted in Torres counseling, suspending, and/or terminating any employees.  Id. at 411-12.  Ms. Guillory directed Torres to submit a revised cure notice response that addressed her comments.[4]  Id. at 412.

## C.  The Solicitation for the Follow-On Contract

As Torres continued to perform under the local guard services contract, and in anticipation of the expiration of that contract, the State Department prepared to solicit proposals for the follow-on contract.  See generally id. at 414-61.  Ultimately, on January 31, 2017, the State Department issued solicitation SAQMMA16R0125, requesting proposals to provide local guard services at the United States Embassy in Asunción, Paraguay, for up to five years (one base year and four option years).  Id. at 462, 465.

Pursuant to Section L of the solicitation, each offeror was to submit its proposal in two volumes, one containing its price proposal and one containing its technical proposal.  Id. at 519-20.  The technical proposal was to be divided into three main sections:  management plan, past performance and experience, and preliminary transition plan.  Id. at 524-25.  The management plan section was to contain five subsections:  organization and management, key personnel, training program, contingency plan, and quality control plan.  Id. at 524.  Of relevance in this protest is the contingency plan, which was to address how the offeror would "ensure continuity of contractually obligated services (anticipated and unanticipated) during adverse events to include (but not be limited to) labor disputes, civil unrest, natural disasters, dissolution of the Joint Venture (if applicable), or any other situation that would negatively impact the U.S. Mission."  Id. at 527; see also id. at 528 (indicating that the following possible occurrences should be addressed in the contingency plan:  labor action, civil unrest, natural disaster, dissolution of joint venture, mass casualty, scheduled and unscheduled absences of key personnel, and currency/economic crisis).  Also relevant in this protest is the past performance and experience section of the technical proposal, for which the offerors were instructed to "[l]ist all contracts and subcontracts the Offeror (and each partner in the joint venture) has held over the past five years for the same or similar work."  Id. at 529.  Further, in the past performance subsection of their technical proposals, offerors were to "[p]rovide the following information for each contract and subcontract":

7.  Brief discussion of any technical problems and their resolution.

8.  Brief discussion of any terminations (partial or complete) and the type (convenience or default) as well as any deficiency notices, corrective action plans, show cause letters or cure notices (provide explanatory details).

---

[4]  Torres's revised response to the cure notice is not included in the administrative record. Torres alleges in its complaint that it sent its revised response to the State Department on May 22, 2017.  Compl. ¶ 57.

    9.  Listing of deductions taken under any listed contracts, with explanatory details and resolution.

    10.  Brief description of any deficiency notices received related to contract non-compliance and a brief description of the corrective actions to remedy the non-compliant performance.

Id.  Offerors were advised that the State Department might contact their customers to "request additional past performance information."  Id. at 529-30.

Because the solicitation provided that the State Department would award the contract to the responsible offeror with the lowest-priced, technically acceptable proposal, id. at 538, the State Department planned to conduct "[a] price evaluation to determine the total price proposed by each Offeror" and a "[t]echnical evaluation to determine the technical acceptability of the offer to the solicitation's technical requirements," id. at 533.  Regarding the latter assessment, the State Department identified the factors and subfactors that it would evaluate, which mirrored the required sections and subsections of the technical proposal, id., and then described the relative importance of each factor and subfactor:

    The relative importance of the technical evaluation factors is:  Factor A, the Management Plan, is relatively equivalent to Factor B, Past Performance and Experience.  Each of those factors is of greater importance than Factor C, the Preliminary Transition Plan.  The sub-factors within Factor A, the Management Plan . . . are listed in descending order of importance[: Organization and Management, Key Personnel, Training Program, Contingency Plan, and Quality Control Plan].  Within Factor B, Past Performance and Experience, the Experience sub-factor is of greater importance than the Past Performance sub-factor.

Id. at 534.  The State Department then addressed how it would evaluate the proposals on each subfactor.  Id. at 535-37.  With respect to the contingency plan subfactor, it provided:

    [T]o be considered acceptable and receive a "pass" in the Contingency Plan sub-factor, the proposal must be complete and clear, comply with the requirements of the solicitation, demonstrate a thorough understanding of the requirements and demonstrate the ability to perform the prospective contract successfully in the areas identified in this sub-factor.

Id. at 536.  And, with respect to the past performance subfactor, it provided:

    Past performance includes the Contractor's record of conforming to contract requirements and to standards of good workmanship; the Contractor's record of forecasting and controlling costs; the Contractor's adherence to contract

schedules, including the administrative aspects of performance; the Contractor's history of reasonable and cooperative behavior and commitment to customer satisfaction; the Contractor's record of integrity and business ethics[;] and generally, the Contractor's business-like concern for the interest of the customer.

> In evaluating past performance, the Government may use past performance information obtained from sources other than those identified by the Offeror in its proposal, e.g., its own records, other Federal agencies or companies, and information available through commercial sources.

> The Government uses past performance information primarily to assess an Offeror's capability to meet the solicitation performance requirements, including the relevance and currency of the Offeror's work experience. . . .

> The Government may obtain past performance information from the Past Performance Information Retrieval Systems (PPIRS).

Id. at 537. Finally, the State Department indicated:

> The Government will evaluate the Offeror's proposal on an Acceptable/ Unacceptable basis. To be considered technically acceptable, the technical proposal must provide the information requested in Section L, conform to the requirements of the solicitation and demonstrate the ability to perform the prospective contract successfully. The Government will consider the [described] factors and sub factors . . . when determining the acceptability of the technical proposal. The Offeror's response, or lack thereof, will be taken into consideration in the final evaluation. A rating of "unacceptable" for any sub-factor listed for the Technical Proposal may render the entire Technical Proposal unacceptable.

Id. at 535; accord id. at 538.

Proposals were due by February 28, 2017. Id. at 462, 518. Only two offerors submitted proposals, id. at 2291, 2303: Torres, a limited liability company, id. at 1139, and G4S, a joint venture between G4S Secure Integration LLC, G4S Secure Solutions International Inc., and Wackenhut Paraguay S.A., id. at 867, 1018, 1021. See also id. at 820-1138 (G4S's proposal), 1139-520 (Torres's proposal).

## D.  Evaluation of Proposals for the Follow-On Contract

Upon their receipt by the State Department, the proposals were evaluated by a Technical Evaluation Panel ("TEP") composed of three individuals–Mr. Welch and two security program officers from the Bureau of Diplomatic Security. Id. at 1527, 1531, 1535. In its initial review, the TEP determined that neither proposal was technically acceptable. Id. at 2291. Accordingly,

it sought additional information from the offerors via letters sent by Ms. Guillory.  Id. at 1536-42.
Specifically, from G4S, the TEP sought information related to the organization and management,
key personnel, quality control plan, and preliminary transition plan portions of its proposal.  Id. at
1536-37.  The TEP did not seek information related to the contingency plan or past performance
portions of G4S's proposal.  Id.; cf. id. at 1074-91 (containing G4S's contingency plan, in which
G4S characterized the [. . .]), 1115-17 (containing G4S's past performance information, which
was presented in three charts–(1) [. . .], (2) [. . .], and (3) [. . .][5]– and reflected that G4S reported
numerous corrective action plans, an even greater number of deductions, and at least one cure
notice).  From Torres, the TEP sought information related to the organization and management,
quality control plan, training program, past performance, and preliminary transition plan portions
of its proposal.  Id. at 1539-41.  With respect Torres's past performance, the TEP requested:

> 1.  . . .  As the incumbent, the Government has noted staffing shortages (i.e.
> [project management] office) during the duration of the contract.  Provide all the
> information as to composition and makeup (to include the list of names) of the
> current [project management office] in Asunción, duration of performing duties
> and description of duties.

> 2.  . . .  Please provide information and detail as to all deductions, contract
> non-compliance letters, deficiency notices and corrective actions plans taken for
> the current contract periods option year three (3) [a]nd Option Year (4) . . . .

Id. at 1541.  In its March 20, 2017 response to the discussion issues, Torres supplied the
requested staffing and past performance information, but also questioned the assertion that there
were staffing shortages in the program management office.  Id. at 1746-53.

It appears that in the meantime, Ms. Guillory prepared a cost/price evaluation report in
which she determined that neither Torres's total evaluated price of [. . .] nor G4S's total
evaluated price of [. . .] was "fair and reasonable," and that both price proposals were
"unacceptable" and "highly risky."[6]  Id. at 2247-51.  But see id. at 2250 (concluding that G4S's
total evaluated price was both "fair and reasonable" and "neither fair nor reasonable," that G4S's
price proposal was both "acceptable" and "unacceptable," and that G4S's price proposal both

---

[5]  "G4S Local Opco" is Wackenhut Paraguay, S.A.  AR 1021, 1023.

[6]  Although Ms. Guillory's handwriting is not clear, the cost/price evaluation report
appears to be dated May 10, 2017.  See AR 2251.  Indeed, that is the date that defendant included
in its index to the administrative record.  However, Ms. Guillory's reference to the need for
discussions, id., suggests that she prepared the report prior to sending the offerors price proposal-
related discussion questions on April 13, 2017, see id. at 1816-21.

carried "little or no risk" and was "highly risky"[7]).  She concluded that discussions were warranted to address her concerns.  Id. at 2251.

On April 13, 2017, Ms. Guillory sent both offerors another letter requesting additional information.  Id. at 1816-21.  Her letter to G4S addressed only one issue–that G4S's proposed price "appear[ed] to be [. . .]."  Id. at 1816.  In response, G4S indicated that [. . .].  Id. at 1823.  Subsequently, in a May 3, 2017 electronic-mail message, Ms. Guillory advised G4S that [. . .].  Id. at 2209.  Neither G4S nor Ms. Guillory referenced the February 2, 2017 amendment to the solicitation in which the State Department [. . .].  See id. at 642, 662-63; see also id. at 1145 (reflecting that G4S acknowledged receipt of the amendment on February 27, 2017).

In her letter to Torres, Ms. Guillory noted that Torres's performance during the fourth option year of the existing local guard services contract was poor in several respects, specifically identifying issues with the mobile patrol, the provision of adequate training, compliance with Post Orders (related to the use of personal cell phones and government-furnished vehicles), and key personnel.  Id. at 1818-20.  Accordingly, she posed the following questions:

> Question 1:  Address the past performance issues identified above for the Mobile Patrol, Training, and Post Orders violations.  How will Torres effectively mitigate these problems and avoid them on the future contract?
>
> . . . .
>
> Question 2:  Mr. [. . .] has been proposed as the [. . .] on your proposal[. H]ow [will] Torres . . . assess and comply with the requirements on . . . solicitation SAQMMA16R0125 having Mr. [. . .] involved in other projects as . . . the [. . .] needs to be dedicated exclusively to the local guard contract . . . ?
>
> Question 3:  The violations of several sections of the contract during the option year (4) in the government's experience is due to lack of oversight from the [project manager] and [local guard force] [sic].  Does Torres plan to reassess the proposed personnel?

Id. at 1820.

---

[7]  These contradictions were not the only errors in the cost/price evaluation report.  In fact, almost every paragraph contains a substantive error, a typographical error, or an inconsistency.  The court recognizes that only a small portion of federal government procurement decisions are protested.  However, this fact does not absolve federal government contracting officials of their duty to ensure that their decisions are documented in a complete and coherent manner.  Ms. Guillory's cost/price evaluation report does not meet this standard.

On April 26, 2017, Torres provided a comprehensive response to the issues raised and questions posed by Ms. Guillory.  See id. at 1836-47.  With respect to the mobile patrol and compliance with Post Orders issues, Torres generally reiterated what had been stated in the correspondence related to those violations, and then answered Ms. Guillory's questions.  See id. at 1837-39, 1842-44.  Then, with respect to the training issues, Torres explained that recent basic training did not last the full eighty hours required by the contract because of the small number of guards being trained, and that the contracting officer's representative was aware of the situation as it was occurring.  Id. at 1840.  But see id. at 2299 (indicating that electronic-mail messages revealed that the contracting officer's representative was informed that training finished early after the training was complete).  Torres also described its training resources.  Id. at 1840-42.  Next, with respect to the key personnel issue, Torres proposed an alternate project manager.  Id. at 1845-47.  Finally, Torres described the positive feedback that it had recently received from embassy personnel regarding its performance.  Id. at 1836-37.

Upon the close of discussions, the TEP evaluated the offerors' final proposals and reached a consensus rating on each factor and subfactor:

| Factor | Torres | G4S |
|---|---|---|
| Management Plan | Acceptable | Acceptable |
| Organization and Management | Acceptable | Acceptable |
| Key Personnel | Acceptable | Acceptable |
| Training Program | Acceptable | Acceptable |
| Contingency Plan | Acceptable | Acceptable |
| Quality Control Plan | Acceptable | Acceptable |
| Past Performance and Experience | Unacceptable | Acceptable |
| Past Performance | Unacceptable | Acceptable |
| Experience | Acceptable | Acceptable |
| Preliminary Transition Plan | Acceptable | Acceptable |

Id. at 2252-90.

With respect to G4S's proposal, the TEP made the following comments regarding the contingency plan subfactor:  "The Offeror prepared a complete and well composed plan that takes various extraneous factors into consideration.  The panel found no weaknesses within the offeror's plan."  Id. at 2255.  It also provided comments regarding the past performance subfactor:  "The Offeror has proven confident [sic] on past performance criteria as they have shown a long history of successful work accomplishments with different agencies locally and

abroad.  The company has significant experience working with US embassies around the world."
Id. at 2257.  Finally, it made the following comments regarding the past performance and
experience factor:  "G4S demonstrated corporate experience working on similar or even more
complex security services overseas.  Past performance is acceptable[.]  The TEP find[s] G4S's
track [sic] of past performance references satisfactory."  Id. at 2259.

With respect to Torres's proposal, the TEP made extensive comments related to Torres's
response to the second round of discussion questions pertaining to past performance.  Id. at 2276-
89.  It concluded:  "The Offeror's past performance and understanding of Embassy Asunción's
current contract, modifications, and exhibits has caused the Panel to question [its] ability to
perform satisfactorily on this project.  Torres'[s] final proposal does not satisfy those questions
. . . ."  Id. at 2289.  It then provided comments regarding the past performance and experience
factor:  "The [f]inal proposal provided additional information related to past
performance and corrective actions.  The Panel does not find Torres acceptable on past
performance and . . . this final proposal does not satisfy the Panel's concerns.  The Panel does not
consider the past performance of this offeror to be advantageous to the US Government."  Id.

In its report to Ms. Guillory, the TEP expanded upon its concerns with Torres's past
performance:

> The Offeror's understanding of Embassy Asunción's current contract,
> modifications, and exhibits has caused the Panel to question [its] ability to
> perform satisfactorily on this project.  The Panel does not have confidence that the
> Offeror can correct the major deficiencies to include mobile patrol issues, lack of
> understanding of post orders and . . . modifications to the contract, violation of
> post orders, [and] lack of quality controls.
>
> The Technical Evaluation Panel found the proposal from Torres . . . very
> risky to the [United States government] . . . .  Past performance issues on Option
> Year Four[ include] misunderstanding of requirements under the current contract,
> lack of quality controls and contract measures of completion, [and] lack of quality
> [c]ompliance review for GEMS reports and therefore incorrect invoicing for
> services that were not rendered.

Id. at 2292-93; accord id. at 2301; see also id. at 2298 ("[P]ast performance issues [related to the
mobile patrols] have put the burden of identifying any and all non-compliance by the Contractor
on the Government, which has in turn forced the Government to spend many man hours via the
[contracting officer's representative] and [locally engaged] staff performing quality control
functions that are contractually required to be performed by the contractor.  The panel finds this
behavior by the contractor to be unreasonable and uncooperative and shows a lack of
commitment to customer satisfaction."), 2299-300 ("[T]he Panel found the lack of demonstrable
understanding of [the contract's training requirements] unacceptable . . . .  In order to conform to
contract requirements, the requirements must be understood.  Failure to understand basic contract

requirements for training demonstrates a potential liability to the [United States government].”),
2300 (finding Torres's explanations regarding the personal cell phone issues unpersuasive).
Ultimately, the TEP found Torres's proposal to be technically unacceptable and G4S's proposal
to be technically acceptable.  Id. at 2293-94, 2296.

In a May 19, 2017 document bearing the title "Price Negotiation Memorandum," Ms.
Guillory summarized the acquisition process for the follow-on local guard services contract,
including the TEP's ratings of the offerors' final proposals.[8]  Id. at 2302-05.  She then related the
TEP's narrative evaluations of proposals.[9]  Id. at 2305-09.  After setting forth the TEP's
comments, Ms. Guillory indicated her agreement with the TEP's conclusions:

> The contracting officer agreed with the TEP findings that G4S is
> technically acceptable.  Revisions to its proposal were logical and satisfactory to
> the TEP and the contracting office [sic].  The contracting officer also agreed that
> Torres was unacceptable due to its past performance and concerns over the
> understanding of current contract commitments reflected [in] their response to
> past performance inquiries.  Therefore, G4S is the only[] technically acceptable
> offeror representing the best value to the Department.

Id. at 2310.  Next, Ms. Guillory conducted a price evaluation.  Id. at 2310-13.  She indicated that
G4S's total evaluated price after discussions was $10,301,376.58, and that Torres's total
evaluated price after discussions was [. . .].  Id. at 2310.  She then analyzed whether G4S's
proposed price was fair and reasonable, given that it was significantly higher than the
independent government estimate of [. . .].  Id. at 2311-13.  She found that the differences
between G4S's proposed price and the independent government estimate could be explained by
valid choices made by G4S and limitations with the independent government estimate.  Id. at
2312-13.  Accordingly, she concluded that G4S's proposed price was fair and reasonable.  Id. at
2313.

---

[8]  Ms. Guillory included in her memorandum a chart purportedly summarizing the TEP's
consensus ratings, but one of the ratings she noted for Torres was inaccurate; the TEP rated
Torres's proposal as acceptable, not as unacceptable, for the management plan factor.  Compare
AR 2296 (reflecting the TEP's acceptable rating), with id. at 2305 (indicating Ms. Guillory's
inaccurate portrayal of the TEP's rating).  However, given that Ms. Guillory's assessment of
Torres's proposal was focused on the past performance subfactor, see id. at 2310, her error likely
did not affect the award decision.

[9]  These narratives were incomplete in two respects:  (1) they did not address each factor
and subfactor evaluated by the TEP, and (2) with respect to the narrative for Torres, Ms. Guillory
only included the TEP's comments on Torres's final proposal, which were focused solely on the
past performance subfactor.  AR 2305-09.

After conducting a price evaluation, Ms. Guillory assessed whether G4S was a responsible offeror.  Id.  She explained:

> The Contracting Officer conducted the requisite checks of [the] Federal Awardee Performance Information and Integrity System (FAPIIS)[ and the PPIRS] for all parties of the joint venture.  The Contracting Officer also checked the System for Award Management (SAM) to ensure there were no active exclusions.  No derogatory information was found that precludes contract award to G4S Secure Integration LLC/G4S Secure Solutions International Inc./G4S Soluciones de Seguridad S.A.[10]

> G4S Joint Venture has adequate financial resources; can comply with the performance schedule; has a satisfactory performance record; and has the necessary organization, experience and technical skills to perform the contract.  In addition, G4S is currently performing satisfactorily under numerous local guard contracts around the world.

Id. (footnote added).  Accordingly, Ms. Guillory determined that it was "in the best interest of the U.S. Government to award a contract for local guard services at the U.S. Embassy in Asunción, Paraguay to the G4S [joint venture] . . . at a fair and reasonable price of" $10,301,376.58.  Id. at 2314.

### E.  Contract Award and Debriefing

On May 31, 2017, Ms. Guillory advised both offerors that G4S had been awarded the contract.  Id. at 2315-17; accord id. at 2325-498 (containing the contract).  Pursuant to the solicitation, the notice to G4S triggered the ninety-day transition period to be conducted in accordance with G4S's transition plan.  Id. at 2315-16.

On June 5, 2017, at Torres's request, Ms. Guillory provided Torres with a written postaward debriefing.  Id. at 2320-24.  She explained that Torres's past performance was deemed unacceptable, and described the deficiencies identified by the TEP.  Id. at 2320-21; see also id. at 2323 ("Torres['s] past performance responses were deemed unacceptable, therefore Torres'[s] proposal was unacceptable[;] G4S'[s] proposal was deemed technically acceptable on all factors.").

---

[10]  According to G4S's proposal, the joint venture was between G4S Secure Integration LLC, G4S Secure Solutions International Inc., and Wackenhut Paraguay S.A.  AR 867, 1018, 1021.  It is unclear why Ms. Guillory checked the databases for information regarding G4S Soluciones de Seguridad S.A., or whether Ms. Guillory checked the databases for information regarding Wackenhut Paraguay S.A.

## II. PROCEDURAL HISTORY

Torres filed the instant protest on June 26, 2017.  In its complaint, Torres alleges that "the State Department intentionally sought to create a basis to deny the award to Torres . . . by taking routine performance issues and exaggerating them into major deficiencies" and "perform[ing] an early and abbreviated CPARS evaluation that could be considered by the TEP as negative past performance information."  Compl. ¶ 27; accord id. ¶ 68 (characterizing the State Department's actions as "mere pretexts").

With respect to the former allegation, Torres states that "the State Department's handling of routine performance issues took a marked shift in March 2017," id. ¶ 65, when Ms. Guillory "began to send Deficiency Letters and Cure Notices herself, bypassing the embassy level communication with the [contracting officer's representative] that had proved effective in all previous years," id. ¶ 67; accord id. ¶ 34.  According to Torres, "[t]he issues raised [by Ms. Guillory] reflected a dramatic change from prior practice, which recognized that a guard force of approximately 85 local guards will occasionally experience issues with guard performance, and instead emphasized responsiveness."  Id. ¶ 67.

With respect to its allegation that the State Department "performed an early and abbreviated CPARS evaluation," id. ¶ 27, Torres asserts that on April 3, 2017, the State Department "posted a CPAR for Torres'[s] performance on the [local guard force] contract during the time period from November 24, 2016 through February 28, 2017," despite the fact that "CPARS reviews were normally conducted on a yearly basis," id. ¶ 47.  Torres further asserts that Mr. Orth discussed the contents of the CPAR "with State Department personnel," including Mr. Welch, during a conference call on April 13, 2017.  Id. ¶ 49.  According to Torres, it submitted its comments on the CPAR shortly after the conference call concluded, but before it did so, it received a cure notice from the State Department.  Id. ¶ 50.

Torres further alleges in its complaint that "[t]he State Department's bad faith toward Torres is rooted, at least in part, in" the fact that Torres filed a bid protest on September 12, 2016, "to challenge the State Department's July 13, 2016 decision to award G4S a contract for the provision of local guard force services at the U.S. Embassy in Buenos Aires, Argentina."  Id. ¶ 28.  In that protest, Torres "alleged that the State Department demonstrated unfair bias toward Torres and treated Torres and G4S disparately."  Id. ¶ 29.  Ultimately, on February 3, 2017, the State Department took corrective action.  Id. ¶ 30.  According to Torres, that protest "angered" the State Department employees responsible for managing local guard force contracts, id. ¶¶ 32, 66, causing them to declare "that Torres would be unable to participate in future solicitations or that it should not 'bother' to do so," and to invite another company "to bid as a competitor to Torres as a 'favor' to the State Department," id. ¶ 33.

In addition to its allegations of bias, Torres alleges that in evaluating the proposals for the follow-on local guard services contract in Asunción, Paraguay, the State Department did not treat the offerors equally but instead subjected Torres's proposal to a higher level of scrutiny.  Id.

¶¶ 70-71.  Specifically, Torres contends that "G4S has a significant history of labor problems in Latin America and performance issues on contracts throughout the world," id. ¶ 71, but that its proposal–the contingency plan in particular–"did not meaningfully address its recent, local history of labor unrest," id. ¶ 73.  Torres also contends that "G4S has had numerous performance issues similar to those used by the State Department to find Torres'[s] past performance unacceptable," id. ¶ 75, but that "the State Department failed to account for these and other deficiencies in G4S'[s] past performance," id. ¶ 76.

Ultimately, Torres asserts that the State Department's award of the follow-on local guard services contract to G4S was arbitrary, capricious, or otherwise contrary to law.  Id. ¶¶ 77-84.  In particular, Torres contends that

- "the [State] Department's solicitation process was marred by irregularity because [it] made unsupported findings of 'unacceptability,' failed to properly weigh the factors and subfactors for Past Performance and Experience, . . . engaged in conduct that showed bias and favoritism, and ultimately awarded the contract to G4S despite Torres'[s] history of acceptable-to-excellent performance in Paraguay and its bid which was significantly lower than G4S'[s] bid," id. ¶ 81;

- "[t]he decision to deny the award to Torres was arbitrary and capricious because the evaluating officials treated Torres and [G4S] in disparate fashion by emphasizing isolated past performance issues for Torres while failing to impose the same degree of scrutiny to the performance issues of the winning bidder," id. ¶ 82;

- "The decision to deny the award to Torres was arbitrary and capricious because it lacked a rational basis and was influenced by the improper conduct and bias of [State Department] personnel," id. ¶ 83; and

- "[t]he State Department violated [the Competition in Contracting Act of 1984] because it did not treat all offerors on a level playing field and did not meet the requirement of full and open competition," id. ¶ 80.

Torres seeks an injunction preventing the State Department from proceeding with the contract awarded to G4S; a declaration that the contract award was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; an order setting aside the contract award and awarding the contract to Torres; and attorney's fees and costs.  Id. at 22-23.

Along with its complaint, Torres filed a motion for a preliminary injunction, and then, two weeks later, its motion to supplement.  The parties briefed both motions on an expedited basis, and the court heard argument on July 28, 2017.

### III.  BID PROTEST STANDARD OF REVIEW

The United States Court of Federal Claims ("Court of Federal Claims") possesses "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement," 28 U.S.C. § 1491(b)(1) (2012), and may "award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs," id. § 1491(b)(2).  The court reviews the challenged agency action pursuant to the standards set forth in 5 U.S.C. § 706.  Id. § 1491(b)(4).  Although section 706 contains several standards, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A):  a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004).

### IV.  TORRES'S MOTION TO SUPPLEMENT

The court first addresses Torres's motion to supplement.  Generally, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."  Camp v. Pitts, 411 U.S. 138, 142 (1973).  An administrative record typically contains the materials developed and considered by an agency in making a decision subject to judicial review.  See id. at 142-43 (remarking that an agency's finding must be "sustainable on the administrative record made" by the agency at the time of its decision); Cubic Applications, Inc. v. United States, 37 Fed. Cl. 345, 349-50 (1997) ("[T]he primary focus of the court's review should be the materials that were before the agency when it made its final decision.").  The administrative record "should be supplemented only if the existing record is insufficient to permit meaningful review consistent with the" applicable standard.  Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009); accord id. at 1380 ("[S]upplementation of the record should be limited to cases in which the 'omission of extra-record evidence precludes effective judicial review.'" (quoting Murakami v. United States, 46 Fed. Cl. 731, 735 (2000), aff'd, 398 F.3d 1342 (Fed. Cir. 2005))).

One situation in which an administrative record may be insufficient to permit meaningful judicial review is when a protestor alleges that a procurement decision was tainted by bad faith or bias.  Inforeliance Corp. v. United States, 118 Fed. Cl. 744, 747 (2014); Int'l Res. Recovery, Inc. v. United States, 61 Fed. Cl. 38, 41-42 (2004); Orion Int'l Techs. v. United States, 60 Fed. Cl. 338, 343-44 (2004).  In such cases, the administrative record is likely to be bereft of evidence to support the protestor's claim.  See Pitney Bowes Gov't Sols., Inc. v. United States, 93 Fed. Cl. 327, 332 (2010) ("Where bias is alleged, the administrative record frequently will not be complete or suffice to prove or disprove the allegation."); Beta Analytics Int'l, Inc. v. United States, 61 Fed. Cl. 223, 226 (2004) ("[R]are indeed would be the occasions when evidence of bad faith will be placed in an administrative record, and to insist on this–and thus restrict discovery regarding bad faith to cases involving officials who are both sinister and stupid–makes little sense.").  However, because of the presumption that federal government contracting officials

perform their duties in good faith, see Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1239 (Fed. Cir. 2002), a protestor may not rely on "innuendo or suspicion" to justify discovery and supplementation of the administrative record with evidence of bad faith or bias, Orion Int'l Techs., 60 Fed. Cl. at 344; accord Pitney Bowes Gov't Sols., Inc., 93 Fed. Cl. at 332 (noting that a protestor's allegations of bias may "not rest merely on counsel's argument, suspicion, or conjecture"); DataMill, Inc. v. United States, 91 Fed. Cl. 722, 732 (2010) (requiring "concrete and specific reasons–rather than nebulous assertions" to establish the necessity for discovery).

Rather, a protestor "must first make a threshold showing of either a motivation for the Government employee in question to have acted in bad faith or conduct that is hard to explain absent bad faith," and then "persuade the Court that discovery could lead to evidence which would provide the level of proof required to overcome the presumption of regularity and good faith." Beta Analytics Int'l, Inc., 61 Fed. Cl. at 226; accord Madison Servs., Inc. v. United States, 92 Fed. Cl. 120, 130 (2010) ("[W]here the procuring agency has provided for its decision a reasonable explanation, borne out by an administrative record that otherwise appears complete . . . , the proffered extra-record material must indicate some personal animus or bias on the part of agency officials, reveal a latent inconsistency in the existing record, or otherwise give some indication that the agency's explanation is pretextual.  Absent this threshold showing, a plaintiff['s] bare allegations of bad faith are insufficient to place the issue or the proffered extra-record evidence before the court.").  The threshold showing made by the protestor must be "strong," Pitney Bowes Gov't Sols., Inc., 93 Fed. Cl. at 332, "based on hard evidence," Int'l Res. Recovery, Inc., 61 Fed. Cl. at 43, and "well grounded," id.  See also Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 420 (1971) (remarking that "there must be a strong showing of bad faith or improper behavior before" a court can permit "the administrative officials who participated in the decision to give testimony explaining their action"), overruled on other grounds by Califano v. Sanders, 430 U.S. 99 (1977); Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1323 n.2 (Fed. Cir. 2003) (holding that the trial court did not err in refusing to allow discovery on the issue of bias because there was no evidence in the administrative record showing bias, and because allegations of error in the evaluation of proposals are "insufficient to overcome the presumption that the contracting officer acted in good faith"); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1341 (Fed. Cir. 2001) ("[D]iscovery of the contracting officer's reasoning is not lightly to be ordered and should not be ordered unless record evidence raises serious questions as to the rationality of the contracting officer's [decision].").

In its motion to supplement, Torres contends that the administrative record lacks the evidence necessary to establish that the State Department's award decision was tainted by bias and bad faith.  It therefore requests that it be permitted to (1) depose Ms. Guillory and Mr. Welch, (2) obtain State Department records concerning G4S's performance on United States embassy contracts, (3) obtain any past performance questionnaires reviewed by the TEP in connection with evaluating G4S's past performance, (4) request certain State Department correspondence and other documents, (5) conduct discovery related to the State Department's

management of performance issues with other local guard services contracts, and (6) supplement the administrative record with the information that it anticipates will be obtained through discovery and the three declarations it attached to its motion to supplement (two from Mr. Orth and one from Alan E. Subirat). According to Torres, the information it seeks will allow it to prove that the State Department's rating of its proposal on the past performance subfactor was motivated by bias, that the State Department's negative assessments of its performance were little more than pretexts for denying it the follow-on local guard services contract, and that the State Department engaged in disparate treatment in favor of G4S. The court addresses each contention in turn.

## A. Bias

First, with respect to its allegation of bias, Torres contends that the State Department's "motivation for concocting an unacceptability finding was rooted in antipathy of certain [State Department] officials against Torres," which, "[f]or at least a year, . . . has manifested through overly critical and biased reviews, adverse treatment of Torres in solicitations, and outright statements of bias." Pl.'s Mot. Suppl. 5. In support of this contention, Torres relies on an electronic-mail message, a conversation, a purported pattern of the State Department rejecting its proposals, and the fact that it alleged bias in a prior protest.

The electronic-mail message that Torres relies on was sent by Edoardo Giglio, an executive director at Field Support Services Group, to an individual at Security and Management Services, Torres's partner on its local guard services contract for the United States Embassy in Pakistan, on April 17, 2017. Mr. Giglio wrote: "We know you are currently partnered with Torres and are aware of the current legal problems which the US State Department has with Torres which will see them not included in any further bidding." Suppl. Orth Decl. Ex. A at 2. Thereafter:

> Torres . . . contacted Mr. Giglio to verify that he sent the email and that he had identified Tim Lykes, the Director of Global Security at Textron Systems, as the source of the statement contained therein that the Department of State had told Torres "not to bother" tendering for the forthcoming Pakistan local guard force contract. Torres contacted Mr. Lykes who stated words to the effect that Torres'[s] relationship with the [State Department] was "vitriolic" and "got to the point where [the State Department] says it's irreconcilable differences." Mr. Lykes declined to identify his sources within the [State Department], but further stated that he "go[es] down to State Department often and [he is] aware of who is in favor and who is not." During that conversation, Mr. Lykes reported that State

Department personnel invited Textron to prepare a proposal for the Pakistan [request for proposals].  Mr. Lykes described Textron's decision to get involved as a "favor" for the Department of State.

Suppl. Orth Decl. ¶ 13.[11]

Neither the electronic-mail message from Mr. Giglio nor the conversation with Mr. Lykes constitutes the strong evidence required to permit discovery and supplementation of the administrative record.  Mr. Giglio's message and Mr. Lykes's conversation concerned a contract in Pakistan, and, to the extent that Mr. Lykes was asserting that the State Department considered its relationship with Torres to be poor as a general proposition, he declined to name any specific State Department employees who held this view.  Allegations concerning another contract and allegations from unnamed State Department employees are woefully inadequate to support a claim that the individuals involved in awarding the follow-on local guard services contract in Asunción, Paraguay–namely, Ms. Guillory, Mr. Welch, and the two other members of the TEP–were biased against Torres.

In addition to relying on the electronic-mail message and the conversation, Torres contends that between 2010 and 2014, it "was awarded a dozen [State Department] local guard force contracts with a success rate of approximately 30%," but thereafter, "[w]ithout any meaningful explanation, . . . the [State Department] began systematically denying [its] proposals."  Pl.'s Reply 4.  Specifically, it notes that it has only been awarded one local guard force contract since 2014 (in Burundi), while at least fourteen other proposals were rejected.  In four cases, Torres's proposal was found to be technically acceptable but was not the lowest-priced.[12]  In another four cases, Torres's proposal was the lowest-priced, but was found to be technically unacceptable.[13]  And, in one case, Torres's proposal was found to be both technically

---

[11]  Defendant argues that the court should not consider the contents of the declarations submitted by Torres in support of its motion to supplement.  The court disagrees; Torres is entitled to "rely on extra-record evidence to support its claim that discovery regarding bad faith conduct is necessary."  Beta Analytics Int'l, Inc., 61 Fed. Cl. at 226.  Indeed, defendant itself relies on extrarecord evidence–the declarations of Ms. Guillory and Mr. Welch–in opposing Torres's motion to supplement.  See, e.g., Def.'s Resp. 31, 33, 36-37.

[12]  Torres submitted these proposals for the following contracts:  Worldwide Protective Services (February 12, 2016), the United States Embassy in Slovakia (June 25, 2016), the United States Embassy in Rwanda (August 18, 2016), and the United States Embassy in Colombia (August 22, 2016).

[13]  Torres submitted these proposals for the following contracts:  the United States Embassy in Guatemala (August 28, 2015), the United States Embassy in Austria (October 13, 2015), the United States Embassy in Botswana (March 2, 2016), and the United States Embassy in Argentina (July 14, 2016).

unacceptable and not the lowest-priced.[14]  Torres argues that the State Department's actions in these post-2014 procurements reflect a pattern of purposely finding Torres's proposals to be technically unacceptable only when Torres offers the lowest price.[15]  However, there is another, innocent explanation for the pattern that Torres discerns in the State Department's actions: Torres's proposals were, in actuality, technically unacceptable when found to be so.  In the absence of any evidence that the State Department improperly found Torres's proposals to be technically unacceptable, Torres's suspicion that the State Department has conspired to reject its proposals in all procurements is insufficient to support its request for discovery and supplementation of the administrative record.

The final evidence of bias offered by Torres relates to the basis of a prior protest it filed in this court.  Specifically, in September 2016, Torres filed a protest challenging the State Department's decision to award the local guard services contract for the United States Embassy in Argentina to G4S.  Torres alleged that in making the award, the State Department "demonstrated unfair bias against Torres and disparate treatment in favor of G4S."  Pl.'s Mot. Suppl. 7.  In one of the declarations that Torres submitted in support of its allegation, Mr. Subirat, who was employed at the United States Embassy in Argentina until December 27, 2016, stated that ten months prior to preparing his declaration in January 2017, two State Department employees at the United States Embassy in Argentina told him "that a Contracting Official in Washington DC pushed them to help remove Torres from being the security guard contractor." Subirat Decl. Ex. A.  Ultimately, on February 3, 2017, the State Department took corrective action.

The fact that the State Department took corrective action in the Argentina procurement after Torres filed a protest alleging bias is not sufficient to allow discovery and supplementation of the administrative record in this protest.  Torres provided no evidence that the State Department employees involved in the Argentina procurement were in any way involved in awarding the follow-on local guard services contract in Asunción, Paraguay; indeed, according defendant, the only overlap was that one individual served on the TEP in both procurements, and that individual was instructed not to discuss the Argentina procurement during the Paraguay procurement.  Moreover, to the extent that the statement relayed by Mr. Subirat is accurate, it pertains to the Argentina contract, not the Paraguay contract.  In short, Torres's invocation of the Argentina procurement in support of its claim of bias in the procurement of the follow-on local guard services contract in Asunción, Paraguay is unavailing.

---

[14]  Torres submitted this proposal for the contract at the United States Embassy in Greece (December 2016).

[15]  This purported pattern is belied by the fact that Torres's proposals have been found to be both technically unacceptable and not the lowest-priced, and by the fact that Torres has actually been awarded a local guard services contract in the relevant time period.

## B. Pretextual Performance Assessments

Second, Torres contends that the State Department "began to manufacture" negative assessments of Torres's performance of the local guard services contract in Asunción, Paraguay as a pretext to denying it the follow-on local guard services contract. Pl.'s Mot. Suppl. 7. In support of this contention, Torres refers to the "shift in March 2017 to a harsh and unrealistic assessment of Torres'[s] performance issues and attempts to remedy them" and "the State Department's decision to conduct an early CPARS review that the TEP could use to support an 'unacceptable' past-performance rating." Id. Torres avers that the adverse performance assessments were done in bad faith, relying on the evidence in the administrative record related to the personal cell phone use, training, and mobile patrol issues.

With respect to its assertion that the State Department began to note deficiencies with its performance more frequently and more harshly, Torres remarks that prior to it filing a protest related to the Argentina procurement, the State Department only "occasionally" cited Torres "for isolated performance deficiencies and credited" Torres "for addressing them quickly and effectively." Id. at 7-8; accord id. at 8 ("Notwithstanding these relatively minor, infrequent performance issues, State Department personnel considered Torres'[s] performance to be very good or exceptional."). Thereafter, Torres asserts, the State Department "began treating what had been routine performance issues as major deficiencies." Id. at 8; accord id. at 18 (asserting that State Department employees "began taking an increasingly aggressive and inflexible stance"). In addition, Torres alleges, the State Department altered how it handled the deficiencies; rather than the contracting officer's representative handling them at the local level, communications mostly originated from the Arlington, Virginia office of the contracting officer. Finally, Torres emphasizes that the State Department approved two of the corrective action plans it submitted on May 22, 2017–related to the personal cell phone use and mobile patrol issues–on June 1, 2017, one day after the State Department awarded the contract to G4S.

While there is no question that the State Department noted deficiencies with Torres's performance more often during the fourth option year of the contract (and beyond) than it did during the first four years of contract performance, and that some of the correspondence regarding the deficiencies originated with the contracting officer rather than the contracting officer's representative, these facts do not suggest that the State Department was inventing reasons to deprive Torres of the follow-on local guard services contract. Torres does not dispute that all of the violations noted by the State Department actually occurred or that the contracting officer was authorized to correspond with it regarding deficiencies. Indeed, the most straightforward explanation for the State Department's actions is that Torres's performance was actually deficient. Accordingly, Torres's allegations are not enough to demonstrate that any State Department employee had a motivation to act in bad faith or that bad faith is the likely explanation for the State Department's actions. Furthermore, the State Department's acceptance of two of Torres's corrective action plans one day after awarding the follow-on local guard services contract to G4S is not, as Torres asserts, evidence that the State Department used the personal cell phone use and mobile patrol issues as mere pretexts for denying Torres that

contract.  There is nothing inherently improper with the State Department requiring, rejecting, and approving corrective action plans.

Next, with respect to its assertion that the State Department conducted an irregular CPARS evaluation for the three-month period ending February 28, 2017, Torres notes that previously, the State Department issued CPARs on an annual basis.  However, defendant, relying on declarations from Mr. Welch and Ms. Guillory and supporting documents, provides a reasonable explanation for the issuance of this CPAR.  As reflected in the administrative record, it was the State Department's practice to prepare a CPAR for Torres at the end of every year of contract performance.  However, on November 22, 2016, Mr. Welch received an electronic-mail message from Torres requesting a past performance questionnaire for use in its proposal for a State Department procurement in Peru.  After learning that the State Department discouraged such questionnaires, Mr. Welch instead prepared a CPAR for the first nine months of the fourth option year.  Then, in keeping with regular practice, the State Department prepared another CPAR for Torres at the end of the fourth option year.

Torres responds that notwithstanding the fact that it requested a past performance questionnaire in November 2016, Mr. Welch should not have prepared a CPAR to satisfy Torres's request because "a [past performance questionnaire] is only required if a CPAR review has not been conducted within the past three years," and a CPAR for Torres's performance already existed within that time period.  Pl.'s Reply 5.  Nevertheless, Torres contends, because a CPAR was prepared in November 2016, there was no reason for the State Department to issue another CPAR three months later, rather than at the end of the contract in August 2017.  Torres's argument is unconvincing.  First, Mr. Welch's preparation of a CPAR in November 2016 was triggered by a request from Torres.  Second, although Torres provides support for the fact that Mr. Welch correctly declined to complete the requested past performance questionnaire, it does not cite any statute, regulation, policy, or procedure prohibiting Mr. Welch from preparing a CPAR in lieu of a past performance questionnaire.  Third, defendant's explanation that the State Department returned to its regular practice of preparing CPARs at the conclusion of each year of contract performance is eminently reasonable; indeed, had the State Department not done so and then awarded the follow-on local guard services contract to Torres, G4S could have argued that the November 2016 CPAR was irregular.  Altogether, Torres has not made a strong showing that the CPAR prepared at the conclusion of the fourth option year was likely the result of bad faith conduct.

## C.  Disparate Treatment

Third, with respect to its assertion of disparate treatment, Torres contends that the State Department overlooked G4S's "failure to provide complete past-performance information as required by the [solicitation],"[16] Pl.'s Mot. Suppl. 12; found G4S's contingency plan to be

---

[16]  A portion of Torres's contention that G4S omitted required past performance information from its proposal was mooted by defendant's subsequent correction of the

acceptable even though it reflected that G4S's [. . .], id.; omitted from the administrative record evidence to support its conclusion that it did not find any "derogatory information" that would "preclude[] contract award" to G4S, id.; disregarded the fact that its "overall past performance [was] no worse than that submitted by G4S," Pl.'s Reply 7; and did not evaluate G4S's proposal in accordance with the solicitation.

In support of its contentions that G4S omitted required past performance information from its proposal and that the State Department omitted supporting information from the administrative record, Torres relies on allegations included in Mr. Orth's supplemental declaration.  Mr. Orth asserts that "Torres has reason to believe that at least one member of the G4S joint venture recently held a contract with Archer Daniels Midland LLC . . . in Paraguay, from which it was removed or replaced due to serious performance issues."  Id. at 12 (citing Suppl. Orth Decl. ¶¶ 5-9).  Mr. Orth further indicates that it was Torres's understanding that "G4S was removed from that contract because its Paraguay based guards were involved in drug smuggling and theft," and "that this information was reported to the State Department."  Id. at 12-13 (citing Suppl. Orth Decl. ¶¶ 9-10).

Torres's allegations regarding the contract between a member of the G4S joint venture and Archer Daniels Midland LLC are nothing more than suspicion and innuendo.  Mr. Orth does not indicate the source of his information, the precise identity of the company that contracted with Archer Daniels Midland LLC, or the individual or individuals at the State Department who were informed of the contract issues.  Accordingly, Torres has failed to make the necessary threshold showing to justify discovery and supplementation of the administrative record.

Next, in support of its contention that G4S's contingency plan failed to [. . .], Torres, relying on Mr. Orth's original declaration, represents that "[p]ublicly available reports show that G4S has a significant history of labor problems in Latin America," and that "mere months before G4S submitted its proposal, G4S'[s] labor force in Paraguay protested the company's alleged violation of their rights to fair compensation, health and safety."  Id. (citing Orth Decl. ¶¶ 45-46).  However, Mr. Orth only specifically references one article:  "Guardias de seguridad se manifestan por derechas eludidados," published in La Nación on December 19, 2016.  Orth Decl. ¶ 45.  Although Torres did not provide a copy or a translation of the article, the article is on La Nación's website,[17] and when run through an online translator,[18] it reveals that G4S's security guards had long been outraged by bad treatment and other irregularities, including salary and

---

administrative record to add six pages from G4S's proposal that had been inadvertently omitted. See Mot. File Attached Administrative R. 2, July 17, 2017; AR 1116.1-.6.

[17]    See Guardias de seguridad se manifestan por derechas eludidados, La Nación, Dec. 19, 2016, http://www.lanacion.com.py/2016/12/19/guardias-seguridad-se-manifiestan-derechos-eludidos/.

[18]    Google Translate, https://translate.google.com/.

bonus issues, but were moved to protest when their Christmas baskets contained only cider and a sweet bread. There is no indication in the article that G4S's security guards engaged in a strike or otherwise stopped working.

According to Torres, the TEP acted improperly by "blindly accept[ing]" G4S's contingency plan. However, Torres does not allege that the TEP knew or should have known of G4S's purported labor problems (of which Torres presents scant evidence); rather, it alleges only that the TEP did not investigate G4S's assessment that there was a [. . .]. Even if the TEP was required to conduct such an investigation, its failure to do so is not necessarily attributable to bad faith. See Info. Tech. & Applications Corp., 316 F.3d at 1323 n.2 (noting that allegations of error in the evaluation of proposals are "insufficient to overcome the presumption that the contracting officer acted in good faith"). Thus, Torres has failed to make the necessary threshold showing to justify discovery and supplementation of the administrative record.

Then, in support of its contention that its reported past performance was roughly equivalent to G4S's reported past performance, Torres relies on (1) the past performance information submitted by G4S in its proposal, which reveals numerous corrective action plans, an even greater number of deductions, and at least one cure notice; and (2) the TEP's failure to remark on these past performance issues. However, while the evidence noted by Torres may support a claim that the State Department did not evaluate the offerors' past performance in an equal manner, it is insufficient evidence that the State Department acted in bad faith in conducting the evaluations. See id.

Finally, in support of its contention that the State Department's evaluation of G4S's proposal diverged from the process described in the solicitation, Torres alleges that the State Department's decision to award the follow-on local guard services contract at a higher price was reached by improperly considering technical factors when evaluating the offerors' price proposals. Torres also contends that the State Department unlawfully made its award decision using a best value trade-off analysis instead of the required lowest-price, technically acceptable approach. While these allegations may support a claim of evaluation error, neither of these purported errors constitutes strong evidence of bad faith.

### D.  Conclusion

As described above, Torres has not offered strong evidence of bias or bad faith to support its request for discovery and supplementation of the administrative record. The court therefore denies Torres's motion to supplement in its entirety.

### V.  TORRES'S MOTION FOR A PRELIMINARY INJUNCTION

The court next addresses Torres's motion for a preliminary injunction. The Court of Federal Claims has the authority to award injunctive relief pursuant to 28 U.S.C. § 1491(b)(2), and is guided in making such an award by Rule 65 of the Rules of the United States Court of

Federal Claims.  Preliminary injunctive relief is an extraordinary and drastic remedy.  Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam); FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993).  A protestor "seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest."  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008); PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004).  None of the four factors, taken individually, is dispositive, and a "weakness of the showing regarding one factor may be overborne by the strength of the others."  FMC Corp., 3 F.3d at 427.  Conversely, "the absence of any one factor may be sufficient" to deny preliminary injunctive relief.  Id.; see also Wind Tower Trade Coal. v. United States, 741 F.3d 89, 100 (Fed. Cir. 2014) ("[A] showing on one preliminary injunction factor does not warrant injunctive relief in light of a weak showing on other factors.").  The award of preliminary injunctive relief is within the discretion of the court.  FMC Corp., 3 F.3d at 427.  "When injunctive relief is warranted, it will only be issued upon a showing by a preponderance of the admissible evidence."  Textron, Inc. v. United States, 74 Fed. Cl. 277, 287 (2006).

## A.  Likelihood of Success on the Merits

To prevail on its motion for a preliminary injunction, Torres must establish that it is likely to succeed on the merits of its protest.  Under the applicable standard of review, see supra Part III, the court

> may set aside a procurement action if "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  A court reviews a challenge brought on the first ground "to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis."  "When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations."

Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citations omitted) (quoting Impresa Construzioni Geom. Domenico Garufi, 238 F.3d at 1332-33); accord Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) ("The arbitrary and capricious standard . . . requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors."); see also Citizens to Preserve Overton Park, Inc., 401 U.S. at 416 ("The court is not empowered to substitute its judgment for that of the agency.").

In addition to showing "a significant error in the procurement process," a protestor must show "that the error prejudiced it."  Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996); see also Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005) (holding

that if the procuring agency's decision lacked a rational basis or was made in violation of the applicable statutes, regulations, or procedures, the court must then "determine, as a factual matter, if the bid protester was prejudiced by that conduct"). "To establish prejudice . . . , a protester must show that there was a 'substantial chance' it would have received the contract award absent the alleged error." Banknote Corp. of Am., 365 F.3d at 1350 (quoting Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1086 (Fed. Cir. 2001)); see also Data Gen. Corp., 78 F.3d at 1562 ("[T]o establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract.").

### 1.  Violation of Applicable Regulations

In its motion for a preliminary injunction, Torres first contends that the State Department violated its obligation to treat Torres "in an impartial, fair, and equitable manner." Pl.'s Mot. Prelim. Inj. 14.  Under the Competition in Contracting Act of 1984, when a federal executive agency conducts a procurement for property or services, it normally must "obtain full and open competition through the use of competitive procedures in accordance with" the pertinent statutes and the FAR.  41 U.S.C. § 3301(a)(1) (2012); accord FAR 6.101 ("[C]ontracting officers shall promote and provide for full and open competition in soliciting offers and awarding Government contracts.").  The FAR requires federal acquisitions to be conducted "with integrity, fairness, and openness," FAR 1.102(b)(3), and instructs contracting officers to "[e]nsure that contractors receive impartial, fair, and equitable treatment," FAR 1.602-2(b); accord FAR 1.102-2(c)(3) (requiring procuring agencies to treat all prospective contractors "fairly and impartially"); FAR 15.306(e) ("Government personnel involved in the acquisition shall not engage in conduct that . . . [f]avors one offeror over another.").

Torres argues that the State Department violated the precepts of these FAR provisions during the procurement of the follow-on local guard services contract by (1) "deciding from the outset that Torres should be denied the Paraguay contract (despite Torres'[s] lowest-priced offer) in retaliation for Torres'[s] Argentina protest or based on the same animus that necessitated that protest in the first instance," (2) undertaking "to generate inaccurate, pretextual past-performance assessments that [the State Department] could rely on to support a finding that Torres'[s] proposal was technically unacceptable," and (3) holding "Torres'[s] proposal to a stricter standard of review and overlook[ing] G4S'[s] comparable history of past performance." Pl.'s Mot. Prelim. Inj. 17-18.  The first two contentions constitute allegations of bias and bad faith, and the third contention is an allegation of disparate treatment.

### a.  Bias and Bad Faith

As previously noted, federal government contracting officials are presumed to perform their duties in good faith. Am-Pro Protective Agency, Inc., 281 F.3d at 1239.  Accordingly, a protestor alleging that a procurement was tainted by bad faith or bias may only overcome that presumption with clear and convincing evidence.  Id.; Galen Med. Assocs., Inc. v. United States,

369 F.3d 1324, 1330 (Fed. Cir. 2004); see also CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1582 (Fed. Cir. 1983) (remarking that "inferences of actual or potential wrongdoing" must be based "on hard facts" and not "on suspicion and innuendo").  Moreover, that evidence must demonstrate "some specific intent to injure the plaintiff."  Torncello v. United States, 681 F.2d 756, 770 (1982), quoted in Galen Med. Assocs., Inc., 369 F.3d at 1330.

In support of its contention that the State Department's decision to award the follow-on local guard services contract to G4S was affected by bias that either predated or resulted from Torres's protest of the award decision in the Argentina procurement, Torres offers nothing more than suspicion and innuendo.  It does not allege that any of the individuals with influence over the procurement in Paraguay–such as Ms. Guillory or Mr. Welch–had any involvement in the procurement in Argentina or, to the extent that such an individual exists, that the individual was biased against it.  Further, the fact that the State Department took corrective action in the Argentina procurement after Torres filed its protest claiming bias does not establish that the State Department was biased against Torres; the State Department could have taken corrective action in response to Torres's claim of disparate treatment or for another reason altogether.[19]  Finally, Torres has not demonstrated that any bias exhibited by the State Department in the Argentina procurement tainted the State Department's actions in other procurements.  In short, Torres has not offered "hard facts" in support of its claim of bias.

In support of its contention that the State Department generated past performance assessments during its performance of the existing local guard services contract as a pretext to deny it the follow-on local guard services contract, Torres again offers nothing more than suspicion and innuendo.  With respect to the performance deficiencies noted by the State Department during the fourth option year of the existing local guard services contract (and beyond), Torres does not dispute that its performance was deficient or that the contracting officer was entitled to correspond with Torres regarding the deficiencies.  Nor does Torres claim that the State Department was acting outside the bounds of the contract in notifying Torres of the deficiencies and requiring corrective action.  Accordingly, the most reasonable explanation for the State Department's actions is that Torres's performance was, in fact, deficient.  Torres has offered no "hard facts" to demonstrate otherwise.  Similarly, with respect to the CPAR that the State Department prepared for the final three months of the contract's fourth option year, Torres has not provided any "hard facts" demonstrating that the State Department was doing anything more than continuing its practice of preparing CPARs at the conclusion of every year of contract performance.

In sum, Torres has not demonstrated that the State Department's decision to award the follow-on local guard services contract to G4S was tainted by bias or bad faith in contravention of the pertinent FAR provisions.

_____

[19]  The notice of corrective action filed by defendant in that protest did not specify the State Department's reason for taking corrective action.  Def.'s Notice Corrective Action, Torres Advanced Enter. Sols., LLC v. United States, No. 16-1128C, ECF No. 36.

### b. Disparate Treatment

The court next turns to Torres's claim of disparate treatment.  It is well established that procuring agencies "must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria."  Banknote Corp. of Am. v. United States, 56 Fed. Cl. 377, 383 (2003) (citing Seattle Sec. Servs., Inc. v. United States, 45 Fed. Cl. 560, 569 (2000)), aff'd, 365 F.3d at 1345; see also L-3 Commc'ns EOTech, Inc. v. United States, 83 Fed. Cl. 643, 653 (2008) ("Waiver of a mandatory requirement of the solicitation for the benefit of only one offeror invalidates a procurement decision."); PGBA, LLC v. United States, 60 Fed. Cl. 196, 207 (2004) ("[U]neven treatment goes against the standard of equality and fair-play that is a necessary underpinning of the federal government's procurement process and amounts to an abuse of the agency's discretion."), aff'd, 389 F.3d at 1219.

In this protest, Torres alleges that the State Department treated it and G4S unequally.[20]  Specifically, it contends that the State Department (1) overlooked G4S's failure to include all required past performance information in its proposal; (2) failed to investigate G4S's representation, in its contingency plan, that the [. . .]; (3) provided no support for its assertion that it did not find any derogatory information regarding the members of the G4S joint venture that would prevent it from awarding the contract to G4S; (4) disregarded that its past performance was no worse than G4S's past performance; and (5) failed to evaluate G4S's proposal in accordance with the solicitation.

First, there is no evidence in the administrative record supporting Torres's contention that G4S did not include all of the required past performance information in its proposal.  Second, Torres has not identified any provision in the solicitation that required the State Department to investigate the representations of the offerors in their contingency plans, especially in the absence of any evidence that those representations were erroneous.  Third, Torres has not identified any evidence in the administrative record reflecting that Ms. Guillory falsely represented that she did not find any disqualifying information when evaluating G4S's responsibility.  Finally, while the administrative record may contain evidence supporting Torres's contention that the State Department evaluated the offerors' proposals on an unequal basis, it is unclear whether the State Department's purported errors (1) constitute violations of the relevant FAR provisions or (2) prejudiced Torres.[21]

---

[20]  Torres also alleges that the State Department's disparate treatment of the offerors was motivated by bad faith.  However, because disparate treatment, regardless of motivation, is a sufficient ground to sustain a protest, the court need not consider whether any disparate treatment by the State Department was motivated by bad faith.

[21]  Because Torres did not have access to the administrative record when it filed its motion for a preliminary injunction, it first raised the unequal evaluation issue in its reply brief.  Defendant and defendant-intervenor addressed the issue at oral argument, but neither party has fully fleshed out its arguments in writing.

In sum, Torres has not established, at this juncture, that it is likely to succeed on its claim that the State Department violated the provisions of the FAR requiring equal treatment.

## 2. Rational Basis

Torres also contends in its complaint and in its motion for a preliminary injunction that the State Department's decision to award the follow-on local guard services contract to G4S lacks a rational basis.  Although it does not devote much attention to this contention in its motion for a preliminary injunction,[22] Torres alleges in its complaint that during its evaluation of proposals, the TEP (1) made "unsupported findings of 'unacceptability,'" (2) "failed to properly weigh the factors and subfactors for Past Performance and Experience," and (3) "ultimately awarded the contract to G4S despite Torres'[s] history of acceptable-to-excellent performance in Paraguay and its" significantly lower total evaluated price.[23]  Compl. ¶ 81.

Torres's allegations pertain mostly to the TEP's evaluation of its past performance. When a protestor challenges a procuring agency's evaluation of past performance, the court's review is limited to ensuring that the evaluation was reasonable and performed in accordance with the solicitation; in other words, the procuring agency's evaluation is entitled to great deference. Am. Auto Logistics, LP v. United States, 117 Fed. Cl. 137, 186 (2014) (collecting cases).  As an initial matter, the administrative record reflects that the TEP evaluated Torres's past performance in accordance with the solicitation.  Pursuant to the solicitation, the State Department intended to evaluate past performance "to assess an Offeror's capability to meet the solicitation performance requirements," and in conducting such evaluations, reserved the right to "use past performance information obtained from sources other than those identified by the Offeror in its proposal, e.g., its own records, other Federal agencies or companies, and information available through commercial sources."  AR 537.  The administrative record reflects that in evaluating Torres's past performance, the TEP relied on the information contained in Torres's proposal, information in its possession regarding Torres's performance as the incumbent contractor (which informed its discussion questions), and Torres's responses to the discussion questions.  There is no evidence in the administrative record indicating that the TEP's evaluation of Torres's past performance contravened the solicitation.

Further, the administrative record reflects that the TEP's evaluation of Torres's past performance was reasonable.  The TEP quite appropriately focused on Torres's most relevant

---

[22]  Indeed, Torres does not pursue this contention in its motion for a preliminary injunction, only briefly asserting that "the decision to deny the award to Torres lacks a rational basis . . . ." Pl.'s Mot. Prelim. Inj. 14.

[23]  To the extent that Torres contends that the State Department's decision to award the follow-on local guard services contract to G4S lacked a rational basis due to the existence of bias, bad faith, or disparate treatment, the court previously addressed those grounds for Torres's contentions.  See supra Section V.A.1.

past performance–its performance on the incumbent contract.  See Seattle Sec. Servs., Inc., 45 Fed. Cl. at 567.  It posed two sets of discussion questions related to the deficiencies in Torres's performance, and after reviewing Torres's responses, concluded that Torres had not sufficiently addressed the underlying issues (related to, for example, mobile patrols, training, personal cell phone use, quality control, and understanding the contract) or convinced the TEP that it could satisfactorily perform under the follow-on local guard services contract.  Both of these conclusions are reasonable and well supported.

Torres also alleges that the TEP improperly weighed the subfactors of the past performance and experience factor.  In particular, Torres implies that an unacceptable rating on a less important subfactor should not result in an unacceptable rating for the factor as a whole when the more important subfactor is rated as acceptable.  As Torres notes, the solicitation provided that the experience subfactor was "of greater importance than" the past performance subfactor.  AR 534.  However, the solicitation also provided that "[a] rating of 'unacceptable' for any sub-factor . . . may render the entire Technical Proposal unacceptable."  Id. at 535. Accordingly, even if the TEP was obligated to rate Torres's proposal as acceptable for the past performance and experience factor as a result of its acceptable rating for Torres's experience (which it was not[24]), the TEP was entitled to rate Torres's technical proposal as unacceptable based only on the unacceptable past performance rating.

Finally, the court notes that the fact that Torres offered the lowest total evaluated price is ultimately irrelevant because the State Department declared its intent to award the contract to the offeror with the lowest-priced, technically acceptable proposal, and Torres's proposal was deemed technically unacceptable.

In sum, Torres has not demonstrated that it is likely to succeed on its claim that the State Department's decision not to award the follow-on local guard services contract to Torres lacked a rational basis.

### 3.  Conclusion

As described above, Torres has not established that it is likely to succeed on the merits of its claims that (1) the State Department violated the provisions of the FAR requiring that all offerors be treated in an impartial, fair, and equitable manner and (2) the State Department's decision not to award the follow-on local guard services contract to Torres lacked a rational basis.  In other words, Torres has not demonstrated that the State Department's decision to award the follow-on local guard services contract to G4S was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.  Consequently, an award of preliminary injunctive relief would not be appropriate.  Nevertheless, for completeness, the court addresses

---

[24]  It is entirely reasonable to suppose a situation in which an offeror's past performance is so poorly rated that it overwhelms the offeror's demonstrated experience.

the remaining factors for establishing the need for injunctive relief: irreparable injury, the balance of harms, and the public interest.

## B. Irreparable Injury

With respect to the irreparable injury factor, a protestor "must show that without a preliminary injunction it will suffer irreparable harm before a decision can be rendered on the merits." Akal Sec., Inc. v. United States, 87 Fed. Cl. 311, 319 (2009); accord IBM Corp. v. United States, 118 Fed. Cl. 677, 683-84 (2014). In its motion for a preliminary injunction, Torres contends that it would be irreparably injured absent a preliminary injunction because it would lose (1) the opportunity to compete for the follow-on local guard services contract, (2) the profits it anticipates from that contract, and (3) the opportunity to obtain effective relief once G4S begins performance of that contract. This court has recognized that a lost opportunity to compete for a contract–and the attendant inability to obtain the profits expected from the contract–can constitute irreparable injury. See, e.g., Akal Sec., Inc., 87 Fed. Cl. at 319; Heritage of Am., LLC v. United States, 77 Fed. Cl. 66, 78 (2007); Overstreet Elec. Co. v. United States, 47 Fed. Cl. 728, 743 (2000). However, G4S is not scheduled to begin contract performance until August 31, 2017. Consequently, the lost profits alleged by Torres cannot be characterized as an irreparable injury at this time. Similarly, Torres remains able to obtain effective relief prior to August 31, 2017–it can seek a permanent injunction. In short, Torres's alleged injuries are not irreparable.

Torres also alleges, in its complaint, that absent a preliminary injunction, G4S will continue its "transition activities unabated during the protest," and as a result, will begin offering employment to Torres's guards (pursuant to a contractual right of first refusal). Compl. ¶ 88. Torres avers that such offers would reduce the number of guards at the embassy, "thereby imperiling the performance of the current contract to the detriment of the U.S. embassy and its staff." Id. However, the depletion of Torres's guard force is not an irreparable injury because Torres is not prevented from hiring new guards to replace the guards hired by G4S or, as defendant notes, from jointly employing guards with G4S during the transition period.

## C. The Balance of Harms

In addition to considering whether a protestor would suffer an irreparable injury absent a preliminary injunction, "[t]he court must balance the harm plaintiff would suffer without preliminary relief against the harm that preliminary relief would inflict on defendant and on defendant-intervenor. Generally, if the balance tips in favor of defendant, a preliminary injunction is not appropriate." Akal Sec., Inc., 87 Fed. Cl. at 320 (citation omitted); accord Reilly's Wholesale Produce v. United States, 73 Fed. Cl. 705, 715 (2006). Torres contends that while the injury it would suffer absent a preliminary injunction is irreparable, the harm that the State Department would suffer from a preliminary injunction is minimal. Defendant disputes Torres's contention, asserting that Torres's contract performance remains deficient and is threatening the security of the embassy. Based on the evidence in the administrative record and

the declarations of Ms. Guillory and Mr. Welch,[25] the court agrees with defendant that the balance of harms strongly weighs in defendant's favor.

Evidence in the administrative record reflects that Torres's deficient performance contributed to two major security breaches.  First, on February 12, 2017, an unknown individual threw two liquid-filled bottles over the embassy's wall.  One guard employed by Torres failed to notice the individual approaching the embassy because she was looking at the screen of her personal cell phone, while another guard employed by Torres observed the individual approaching the embassy, throwing the bottles, and leaving the scene, but did nothing to prevent the incident or apprehend the individual.  Further, throughout the remainder of the twelve-hour shift, the first guard continued to use her personal cell phone and watch movies on a government-provided computer, ignoring her duties, and a senior guard sat beside her, also using his personal cell phone and watching movies.

Second, at the end of February 2017, a residence used by the embassy was burglarized, and an investigation revealed that the mobile patrol assigned to that route did not check the residence for a twelve-hour period (during which the burglary occurred), when at least three such checks should have occurred.  Had the mobile patrol checked the residence as required, the burglary might have been averted or, at a minimum, the window of investigation would have been considerably shorter than twelve hours.

According to the State Department, a third troublesome incident occurred shortly after it awarded the follow-on local guard services contract to G4S.  Sometime between June 9 and June 11, 2017, Torres's office was burglarized.  Among the items Torres reported stolen were ten laptop computers; a thumb drive; and a safe containing $40 cash, current and old checkbooks, and a banking fob.  Documents stored on one of the laptop computers–belonging to Mr. Segovia and password-protected–included human resources documents and the existing local guard services contract (including exhibits).  Documents stored on the thumb drive–which was inserted in Mr. Segovia's laptop computer and was not password-protected–included General and Post

---

[25] The court is permitted to consider extrarecord evidence, such as declarations from relevant officials at the procuring agency, in assessing the harm that the procuring agency would suffer from the imposition of an injunction.  See PlanetSpace, Inc. v. United States, 90 Fed. Cl. 1, 5 (2009) ("Standing apart from evidence supplementing the administrative record . . . are evidentiary submissions that go to the prospective relief sought in this court.  The latter relate to an issue wholly within the court's purview.  Accordingly, '[i]t is the responsibility of this [c]ourt, not the administrative agency, to provide for factual proceedings directed toward, and to find facts relevant to, irreparability of harms or prejudice to any party or to the public interest through grant or denial of injunctive relief.' . . . Evidence respecting relief . . . 'necessarily would not be before an agency decision-maker effecting a procurement decision such as a source selection award, . . . but would necessarily post date and flow from such agency decision.'  Accordingly, such evidence is admitted, not as a supplement to the administrative record, but as part of this court's record." (citations omitted)).

Orders, Torres policies, Torres training materials and records, and the existing local guard services contract (including exhibits).  These documents contained the locations of all guard posts, the guards' schedules, and guard orders for normal and emergency operations.

A Torres employee discovered the burglary on June 13, 2017, and reported it to Mr. Segovia.  Mr. Segovia then reported the burglary to the Paraguayan National Police, Mr. Orth, and Torres's CEO, but not to any United States government officials.  Mr. Welch learned of the burglary on June 16, 2017, after an embassy employee mentioned a news report regarding the discovery of the stolen safe, but was not told until the following day that contract-related documents had been stolen.  Ms. Guillory sent Torres a letter on June 19, 2017, describing the "major" performance deficiencies related to the burglary:  Torres's failure to file an incident report and Torres's failure to safeguard information.[26]  Def.'s Resp. Ex. E at 1-2.  She advised Torres that these deficiencies would be noted on its CPAR.  She also characterized Torres's failure to notify the State Department of the burglary as a "very grave breach of trust."  Id. at 2.

In their declarations, both Ms. Guillory and Mr. Welch explain that Torres's recent history of deficient performance–especially as related to the bottle-throwing incident, the residential burglary, and the burglary at Torres's office–has endangered the safety and security of five embassy facilities, sixty residences, and more than 300 embassy employees and family members.  They have lost all confidence that Torres can fulfill the contract's mission to protect United States personnel and property.

All of the incidents described by the State Department reveal serious issues with Torres's performance, but the court is especially troubled by Torres's failure to report the June 2017 burglary to the State Department immediately upon its discovery.  The documents that Torres believed were stolen included extremely sensitive information that would be valuable in planning an attack on the embassy or its employees.[27]  That it took four days for Torres to inform the State Department that this information had been stolen suggests that Torres does not fully comprehend

---

[26]  Section H.17 of Torres's local guard services contract obligates Torres to safeguard all information related to Torres's performance of the contract.  AR 48-49.  General Order 9 requires Torres to submit an incident report to the regional security officer within twenty-four hours of an incident that is "not of a routine nature."  Id. at 164.

[27]  In a declaration prepared on July 25, 2017, Ivana Paola Tuset Roiz, Torres's Administrative and Human Resources Manager, stated:  "Contrary to the initial reports and discussions with the [contracting officer's representative], Victor Segovia's laptop was not stolen, but was instead later located in Torres'[s] main Paraguayan office . . . ."  Tuset Roiz Decl. ¶ 7.  This statement does not negate that Torres (1) believed that the laptop computer and attached thumb drive had been stolen, (2) advised the State Department as late as June 26, 2017, that the laptop computer and attached thumb drive had been stolen, or (3) did not inform the State Department that it believed that contract-related documents were stolen until four days after it discovered the burglary.

the importance of its mission to ensure the safety and security of the embassy and its employees.[28]  Consequently, the harm in allowing Torres to continue to perform beyond the August 30, 2017 contract expiration date–the natural result of a preliminary injunction, which would halt the current transition[29]–is too great to ignore.  The balance of harms is unambiguously in defendant's favor.[30]

## D. The Public Interest

Finally, when "employing the extraordinary remedy of injunction," a court "should pay particular regard for the public consequences" of doing so.  Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982).  There is no dispute that "the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid."  Overstreet Elec. Co., 47 Fed. Cl. at 744; accord Bona Fide Conglomerate, Inc. v. United States, 96 Fed. Cl. 233, 242 (2010) (noting the "overriding public interest in preserving the integrity of the procurement process").  "However 'there is a countervailing public interest in minimizing disruption [to the agency].'"  Akal Sec., Inc., 87 Fed. Cl. at 321 (quoting Heritage of Am., LLC, 77 Fed. Cl. at 78); accord Aero Corp., S.A. v. United States, 38 Fed. Cl. 237, 242 (1997) ("[A] procuring agency should be able to conduct procurements without excessive judicial infringement upon the agency's discretion.").  In this protest, there is a significant public interest in ensuring the safety of United States citizens (and the security of United States property) abroad.  This interest is endangered when the federal government lacks confidence that its chosen contractor can provide the necessary protection.  Accordingly, the public interest weighs in defendant's favor.

## VI.  CONCLUSION

For the reasons set forth above, the court **DENIES** Torres's motion to supplement and **DENIES** Torres's motion for a preliminary injunction.  As discussed after oral argument, the parties will provide the court with a proposed schedule for further proceedings.

---

[28]  During oral argument, counsel for Torres averred that a Torres employee had been directed to inform the State Department of the burglary, but failed to do so.  While this may be true, the court cannot accept a factual representation in the absence of a sworn declaration from someone with personal knowledge.

[29]  Ms. Guillory states that the State Department and G4S are "approximately halfway through the transition period" and that "[s]topping the transition now would essentially require an entirely new 90 day transition period at the end of the protest . . . ."  Guillory Decl. ¶ 26.

[30]  G4S would also be harmed by a preliminary injunction due to the need to halt the transition.

The court has filed this ruling under seal.  The parties shall confer to determine agreed-to proposed redactions.  Then, by **no later than Friday, August 18, 2017**, the parties shall file a joint status report indicating their agreement with the proposed redactions, **attaching a copy of those pages of the court's ruling containing proposed redactions, with all proposed redactions clearly indicated.**

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge